[Nos. 36129, 36216.   Department Two.   September 20, 1962.]

THE STATE OF WASHINGTON, *on the Relation of Carl Pruzan, Respondent,* v. M. C. REDMAN *et al., Respondents,* HARVEY MURDOCK *et al., Intervenors-appellants.*

THE STATE OF WASHINGTON, *on the Relation of Harvey Murdock et al., Appellants,* v. M. C. REDMAN *et al., Respondents.**

*Reported in 374 P. (2d) 1002.

*Hullin, Ehrlichman, Carroll & Roberts*, for appellants.

*Archie Baker* and *Jack M. Sawyer*, for respondent Pruzan.

*Derrill T. Bastian*, for respondents Redman *et al.*

*James A. Murphy*, amicus curiae.

HUNTER, J.—The above cases were consolidated for review on appeal. Both cases involve the legality of a conditional use permit, issued by the Board of Adjustment of King County, for the construction of a radio transmitter station in King County.

Carl Pruzan is the owner of 17 acres adjoining the city limits of Bellevue, in King County, which is zoned by the county as A-1 for agricultural use under King County Zoning Code, Resolution No. 18801, § 14. He is also the owner of radio station KUDY, which is a standard broadcasting facility licensed by the Federal Communications Commission (hereafter referred to as FCC). He filed an application with the Board of Adjustment (hereafter refer-

red to as the board) for a conditional use permit to construct a radio transmitter station for KUDY. The location was approved by the FCC. The use permit would allow the construction of a one-story building and three 240-foot steel radio towers.

After a public hearing, as required by King County Resolution No. 20216, § 21, subsection 29.05, the board, on February 16, 1961, passed a motion determining it did not have jurisdiction under subsection 4.02 of the King County Zoning Code, *supra*, but providing that in the event the superior court determined the board did have jurisdiction, it was proper, as a result of the court's findings, that a conditional use permit should be granted. Thereafter, Mr. Pruzan, as the plaintiff, on February 24, 1961, obtained a writ of certiorari from the Superior Court for King County, to review the determination of the board.

At the hearing on the writ, on March 10, 1961, the court held the board had jurisdiction and, on the basis of the proviso in the board's decision, directed that the conditional use permit be issued. Residents and abutting property owners to the proposed location, Harvey Murdock, A. L. Durkee, Lloyd C. Murdock and John Murdock, were permitted to intervene, on March 14, 1961, and to file a motion for the reconsideration of the jurisdictional question alone. After a hearing on the motion to reconsider, on March 15, 1961, the court denied their motion and entered the final order. Thereupon, the intervenors appealed to this court from the order in cause No. 36129.

Upon the issuance of the conditional use permit by the board to the plaintiff on March 16, 1961, the intervenors in cause No. 36129, as relators in cause No. 36216, obtained a writ of certiorari from the King County Superior Court to review this action of the board.

In pursuance of a hearing upon the writ on all issues except on the question of jurisdiction of the board to issue the conditional use permit, an order was entered on June 12, 1961 quashing the writ and affirming the decision of the board. From this order, the relators have appealed.

By reason of the consolidation of the appeals, the assignments of error raised by the appeals will be considered as if there were only one appeal before us. The parties who are intervenors in cause No. 36129 and relators in cause No. 36216, being the same persons, will be referred to as the appellants. The owner of radio station KUDY, plaintiff in the former case and intervenor in the latter case (respondent on this appeal), will be referred to as KUDY.

The appellants first assign error to the trial court's finding that the board had jurisdiction to issue the conditional use permit to KUDY.

It is agreed that this question will be resolved by the determination of whether a radio broadcasting station is a utility within the meaning of the zoning code which states:

"SECTION 4. R-6   RESIDENTIAL SINGLE FAMILY DISTRICT,

. . .

"4.02 USES PERMITTED AFTER REVIEW BY THE BOARD OF ADJUSTMENT AND AFTER THE ISSUANCE, BY THE BOARD OF ADJUSTMENT, OF A CONDITIONAL USE PERMIT.

"1. *Public utility* and governmental buildings or structures including art galleries, libraries and museums: . . ."

The term public utility, with which we are here concerned, does not involve the distinction between public ownership and private ownership of a utility. The question is whether the privately owned facility, in the instant case, is so impressed with a public interest that it comes within the field of public regulation and, as such, is a public utility within the broad meaning of the term.

This court has not heretofore had occasion to pass on this question, probably because the FCC has pre-empted the field in the regulation of radio broadcasting stations and, therefore, this state has not found it necessary to subject this industry to utility regulation. It is, however, well established in the decisions of our federal courts that the public interest is so directly affected in the business of radio broadcasting operations that such business is, in a

sense, a public utility necessarily subject to government regulation and controls.

This was also recognized by the United States Congress in the enactment of the Federal Communications Act of 1934, as amended, 47 U.S.C.A. § 303, p. 77. The enactment is predicated upon public convenience, interest, use and necessity, as required, and enumerates the powers and duties of the FCC in eighteen specific sections. For brevity, we quote in part:

"(a) Classify radio stations;

"(b) Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

"(c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;

"(d) Determine the location of classes of stations or individual stations;

"(e) Regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein;

"(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter: *Provided, however,* That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless, after a public hearing, the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this chapter will be more fully complied with;

"  .  .  .

"(h) Have authority to establish areas or zones to be served by any station;

"(i) Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

"(j) Have authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable;

"  .  .  .

"(o) Have authority to designate call letters of all stations;

"(p) Have authority to cause to be published such call letters and such other announcements and data as in the judgment of the Commission may be required for the efficient operation of radio stations subject to the jurisdiction of the United States and for the proper enforcement of this chapter;

"(q) Have authority to require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation.

"(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party."

In comparing the regulations of a transportation public utility under the Transportation Act and the Emergency Railroad Transportation Act, 49 U.S.C.A. § 250, et seq., with the regulations of the public utility of radio broadcasting under the Federal Communications Act, the court said in *Yankee Network, Inc. v. Federal Communications Comm.*, 107 F. (2d) 212 (1939):

"In the regulation of radio broadcasting as distinguished from transportation or radio communication, Congress was dealing with a newer and less well established form of public service.

" . . .

"In each case Congress has delegated the power to regulate public utilities in interstate commerce for the purpose of safeguarding a dual interest, involving a reciprocal and correlative relationship between the public and the owner of the utility. As between the two, the public interest is of greater importance. Therein lies the justification for governmental regulation, and for placing in the hands of such administrative agencies as the Federal Communications Commission powers, which if arbitrarily exercised, may destroy the very subject of regulation. . . ."

In *Sanders Bros. Radio Station v. Federal Communications Comm.*, 106 F. (2d) 321 (1939), the court said:

"While a radio broadcasting station is not a public utility in the same sense as a railroad, nevertheless radio communication constitutes interstate commerce and involves the public interest, and it is in this respect that Congress has exercised its power to regulate it. Since the power of Congress has not been extended to the point of regulating rates for service, or the establishment of rules requiring like service for the entire public, or limiting profits on the basis of investment, or otherwise, the term—public interest, convenience and necessity—should not be given such a broad meaning as has been applied to it elsewhere in the interpretation of public utility legislation. . . ."

In *Pulitzer Pub. Co. v. Federal Communications Comm.*, 94 F. (2d) 249 (1937), it was contended that a broadcasting station is a public utility, and therefore a new utility ought not be allowed to enter the field until an old established utility is given an opportunity to extend its service. The court there stated:

"But we have never said that a radio broadcasting station is a public utility in the sense in which a railroad is a public utility. Generally speaking, that term comprehends any facility employed in rendering quasi public service such as waterworks, gas works, railroads, telephones, telegraphs, etc. . . .

"As long as this continues to be the policy of Congress, the term—public convenience, interest, or necessity—should not be given such a broad meaning as is applied to it elsewhere in public utility legislation. . . ."

■ From the foregoing cases, it is clear that although a radio broadcasting station does not constitute a public utility in the ordinary sense, it is, nevertheless, a public utility in a limited sense impressed with a public interest.

As stated by the trial court, the public utility to which a conditional use permit may be issued by the board is not qualified by any language in the zoning code, *supra*. Subsection 4.02 of the zoning code, therefore, is sufficiently broad to give the board jurisdiction to issue a use permit for a radio broadcasting facility.

The appellants contend that the trial court erred in failing to hold that subsection 4.02, which provides for the issuance of conditional use permits by the board, is unconstitutional. It is argued that the board has not been provided with sufficient standards by which to carry out its function of granting conditional use permits; therefore, resultant "spot zoning" is a violation of Art. 1, § 12 of the Washington State Constitution, and the inadequacy of standards constitutes an unlawful delegation of legislative power in violation of amendment 7 to the state constitution.

The appellants first argue that the operating statute relative to conditional use permits for an A-1 agricultural zone, as codified in § 14 of the zoning code, *supra*, is invalid in that the purported criteria and standards are in subsection 4.02 of the code and relate only to conditional use permits for public utilities in R-6, single family residential zones.

The appellants are in error. Section 14, subsection 14.01:1, as amended by § 17 of resolution No. 20216, provides:

"SECTION 14. A-1 AGRICULTURAL DISTRICT REGULATIONS, amend by adding after Sub-Section 14.01, a new Sub-Section to be Sub-Section 14.01:1 and to read as follows:

"14.01:1 USES PERMITTED AFTER REVIEW BY THE BOARD OF ADJUSTMENT AND AFTER THE ISSUANCE, BY THE BOARD OF ADJUSTMENT, OF A CONDITIONAL USE PERMIT.

"1. Any use permitted in the R-6 (4.02) through R-15 (9.02) and S-1 (13.02) Districts which require conditional use permits."

The standards and criteria governing the issuance of such conditional use permits authorized by this amendment are contained in the succeeding §§ 18 and 21 of resolution No. 20216, *supra*, which amends the zoning code:

"SECTION 18.

"SECTION 27. GENERAL PROVISIONS, amend by adding hereto a new Sub-Section to precede existing Sub-Section 27.01, to be Sub-Section 27.00:1 and to read as follows:

"27.00:1 When considering an application for conditional use permit, the board of adjustment shall consider the applicable standards, criteria and policies established by this Resolution as they pertain to the proposed use and may impose specific conditions precedent to establishing the use and said conditions may include:

"(a) increasing requirements in the standards, criteria or policies established by this resolution;

"(b) stipulate the exact location as a means of minimizing hazards to life, limb, property damage, erosion, land slides or traffic;

"(c) require structural features or equipment essential to serve the same purpose set forth in item (b) above;

"(d) impose conditions similar to those set forth in items (b) and (c) above as deemed necessary to establish parity with uses permitted in the same zone in their freedom from nuisance generating features in matters of noise, odors, air pollution, wastes, vibration, traffic, physical hazards, etc., provided the board of adjustment may not in connection with action on a conditional use permit reduce the requirements specified by this Resolution as pertaining to any use nor otherwise reduce the requirements of this Resolution in matters for which a variance is the remedy provided."

"SECTION 21.

". . .

"29.03 BOARD OF ADJUSTMENT MAY GRANT CONDITIONAL USE PERMITS.

"Upon application therefor the Board of Adjustment may grant conditional use permits for such uses and under such circumstances as are set forth in this Resolution.

"29.04 SCOPE OF AUTHORITY ON CONDITIONAL USE PERMITS.

"In addition to other standards which the Board of Adjustment may impose by virtue of other provisions of this Resolution, the Board of Adjustment may require such conditions as will:

"(a) assure that the degree of compatibility made the purpose of this Resolution shall be maintained with respect to the particular use on the particular site and in consideration of other existing and potential uses within the general area in which such use is proposed to be located; and

"(b) recognize and compensate for variations and degree of technological processes and equipment as related to the factors of noise, smoke, dust, fumes, vibration, odors and hazard or public need; and

"(c) the Board of Adjustment shall have the authority to adjust any and all prescribed standards or conditions for a conditional use permit as provided in Sub-Section 27.00:1."

The contention that there are no standards regulating the issuance of conditional use permits in an A-1 agricultural district is without merit.

The appellants contend that the language in subsection 29.04(a), *supra*, relative to "the degree of compatibility made the purpose of this Resolution," is meaningless because the degree of compatibility is not spelled out in the purpose of the resolution. The appellants are also in error in this regard. The purpose as stated in § 1 of the zoning code, as amended by § 2 of resolution No. 20216, *supra*, includes procedures involving conditional use permits which are defined in subsection 2.04 "C" of the zoning code, as amended by § 4 of resolution No. 20216, *supra*, where the degree of compatibility referred to is contained:

"2.04 'C'

"Conditional Use: Conditional use means a use listed among those classified in any given zone but permitted to locate only after review by the Board of Adjustment, and the granting of a conditional use permit *imposing such performance standards as are contained in this resolution that make the use compatible with other permitted uses in the same vicinity and zone.*" (Italics ours.)

In considering appellants' contention that subsection 4.02 of the zoning code, *supra*, constitutes a violation of amendment 7 to the state constitution, we refer to *Keeting v. Public Util. Dist. No. 1*, 49 Wn. (2d) 761, 306 P. (2d) 762 (1957), where we stated the requirements essential for the legislature to avoid an abdication of its power to an administrative body:

" . . . It is unconstitutional for the legislature to abdicate or transfer to others its legislative function. It is not unconstitutional for the legislature to delegate administrative power. In so doing, the legislature must define (a) what is to be done, (b) the instrumentality which is to accomplish it, and (c) the scope of the instrumentality's authority in so doing, by *prescribing reasonable administrative standards.* . . ." (Italics ours.)

In determining whether there has been an unlawful delegation of power to an administrative agency, we must recognize that the complexity and character of the subject matter of legislation are to be considered, and that it is unfeasable for the legislative body to spell out in detail

the standards and criteria to cover every factual situation. *Yelle v. Bishop*, 55 Wn. (2d) 286, 347 P. (2d) 1081 (1959).

■ In view of the nature of land-use regulation, we are satisfied that the standards and criteria set out in the foregoing sections of the resolution provide sufficient reasonable conditions and safeguards to control the board's discretion essential to a lawful delegation of administrative power. See *State ex rel. Washington Toll Bridge Authority v. Yelle*, 195 Wash. 636, 82 P. (2d) 120 (1938); *Wheeler School Dist. v. Hawley*, 18 Wn. (2d) 37, 137 P. (2d) 1010 (1943); *Kelleher v. Minshull*, 11 Wn. (2d) 380, 119 P. (2d) 302 (1941).

The appellants further argue, however, that the board has been delegated legislative powers without standards and criteria because of the provision in the zoning code which gives authority to enlarge the required conditions for use permits. We disagree.

This authority to enlarge conditions is pursuant to establishing the conditional use considered under the "applicable standards, and criteria and policies established by this Resolution as they pertain to the proposed use." Subsection 27.00:1 of the zoning code, *supra*, as amended by resolution No. 20216, *supra*. The authority to enlarge the conditions, therefore, is limited by adequate standards.

The contention of appellants that the ordinance violates Art. 1, § 12 of our constitution, for the reason that it results in "spot zoning," is disposed of by our determination that the standards and criteria provided for the issuance of a conditional use permit are adequate.

The appellants contend the board ignored the planning of the city of Bellevue in its consideration of the standards of "compatibility" to other existing potential uses within the "general area"; that this was arbitrary and capricious and in violation of RCW 35.63.070, which appellants contend declares a public policy that counties and cities should mutually consult when planning and zoning common areas.

In considering this contention, we need only decide whether the board did consider the planning of the city of Bellevue. This is answered in the record by the following quotation from the board's findings:

" . . . This proposed installation has been approved twice by the Bellevue City Planning Commission but has been denied by their City Council."

The appellants contend the trial court erred "in failing to hold the Board of Adjustment without power to issue a conditional use permit for 240 foot high towers in violation of the 35 foot height limitation established by Resolution 18801, Sec. 14.02." Subsection 27.02 of the zoning code (resolution No. 18801) provides:

"1. Towers, gables, spires, scenery lofts, cupolas, water tanks, silos, artificial windbreaks, barns, windmills and similar structures and necessary mechanical appurtenances may be built and used and natural growth may be allowed to grow to a greater height than the limit established for the district in which structures are located, except in Landing Field Districts; provided, *however, that no structure in excess of the allowable building height shall be used for sleeping or eating quarters or for any commercial purpose other than such use as may be incidental to the permitted uses of the main building.*" (Italics ours.)

In view of the above provision, the issue here is not whether the board had power to grant the permit, but whether the radio towers to be built come within the meaning of the language "*such use as may be incidental to the permitted uses of the main building.*" It is inherent in the board's order granting the conditional use permit that it found the structural plans to meet the requirements of the zoning code. Furthermore, the trial court stated in its oral memorandum opinion as follows:

"This little question about the interpretation of Section 2702 requiring that structures over 35 feet be incidental to the main use of the building is a most difficult one but I think a fair interpretation of that language and, indeed, the interpretation used by the county over many years would be that these towers are actually incidental to this building and not the building incidental to the towers. I cannot believe that it was the intention of the persons who drew this act to be quite that technical."

The record taken before the board shows that the building to be located on the site will be 15 feet in width and 20 feet in depth. The three towers on the site will be

240 feet in height and triangular in shape, 18 inches on a side. The building is to house transmitters, store miscellaneous equipment and to be available as a supplementary or standby broadcasting facility. Upon this record, there is room for reasonable minds to differ as to whether the towers are incidental to the building, and we cannot say that the board acted arbitrarily in granting the use permit in the consideration of this factual issue. *King Cy. Employees' Ass'n v. State Employees' Retirement Board*, 54 Wn. (2d) 1, 336 P. (2d) 387 (1959).

We do not discuss appellants' remaining assignment of error since it is controlled by our disposition of other issues raised on this appeal.

The judgment of the trial court entered in cause No. 36129 and cause No. 36216 is affirmed.

FINLEY, C. J., OTT, and HAMILTON, JJ., concur.

DONWORTH, J. (dissenting)—I dissent. The majority states that "although a radio broadcasting station does not constitute a public utility in the ordinary sense, it is, nevertheless, a public utility in a limited sense impressed with a public interest." I agree.

However, the above-quoted sentence is necessarily predicated on the premise that the term "public utility" can mean different things in different contexts. The question before us, then, is not whether a radio station can ever be called a public utility, but whether the proposed structures (which include a one-story building and three 240-foot radio towers) constitute a public utility within the meaning of King County Zoning Resolution No. 18801, as amended by resolution No. 18844, § 4.02, which section was amended by resolutions No. 19766, 20216, and 20432. (This section is codified, except for title, in Book Publishing Company's "King County Code" as § 24.10.020.)

The relevant provisions of that section follow:

"4.02 USES PERMITTED AFTER REVIEW BY THE BOARD OF ADJUSTMENT AND AFTER THE ISSUANCE, BY THE BOARD OF ADJUSTMENT, OF A CONDITIONAL USE PERMIT.

"1. Public utility and governmental buildings or struc-

tures including art galleries, libraries and museums:

"...

"(d) Public utilities must be shielded from abutting properties and highways by a sight-obscuring protective strip of trees or shrubs."

The majority opinion states that the term "public utility" was not qualified in the zoning code. If a "public utility" cannot meet the conditions set out in the above-quoted section of the code, it is presumably not the type of public utility contemplated by that section. To that extent, the term "public utility" is qualified.

Other factors tend to confirm my belief that the radio transmitter facility involved herein is not a public utility within the meaning of the zoning ordinance. The station does not necessarily have to be located within an area zoned for single-family dwellings in order to serve that community. In that respect, it is unlike an electric power substation, a branch telephone exchange, or a sewage treatment plant. Furthermore, the purpose in establishing this radio station is only partly to serve the local community. Actually, the main radio station, of which the proposed structures are an adjunct, is located in Seattle. The primary motivation is commercial. Again, this is unlike the public utilities which are necessarily located in a single-family district for the purpose of serving that particular area.

In my opinion, the respondent's proposed radio transmitter facility, with its 240-foot transmitter towers, is not a "public utility" within the meaning of the King County Zoning Code. Therefore, the Board of Adjustment did not have jurisdiction to issue a conditional use permit in this case.

Nothing stated herein is intended to apply to any situation other than the one before the court.

I would reverse and dismiss this action because of the board's lack of jurisdiction.