[No. 44505. En Banc. March 30, 1978.]

SAVE A VALUABLE ENVIRONMENT, *Respondent,* v. THE CITY OF BOTHELL, ET AL, *Defendants,* DOMENICO VITULLI, ET AL, *Appellants.*

*Hillis, Phillips, Cairncross, Clark & Martin, P.S.,* by *Jerome L. Hillis, Peter L. Buck,* and *Susan R. Agid,* for appellants.

*David Schnapf* and *Hubbard & Burns, Inc., P.S.,* for respondent.

HOROWITZ, J.—This appeal concerns the validity of a zoning ordinance of the City of Bothell, which rezones a

parcel of farmland to permit construction of a major regional shopping center, and of the proceedings leading to its enactment. A judgment entered in King County Superior Court invalidated the ordinance on the grounds it constituted illegal spot zoning and the proceedings prior to its enactment violated the appearance of fairness. The trial court also held respondent nonprofit corporation had standing to maintain the action. We affirm for reasons hereafter stated.

The property which is the subject of the rezone, the Vitulli farm, is approximately 141 acres in North Creek Valley. It is located entirely within the city limits of Bothell. According to Bothell's 1971 comprehensive plan, the area is "Greenbelt/Agricultural." The farm was previously zoned for agricultural use. The parcel is bounded on the north by Snohomish County, which controls 80 percent of the land of North Creek Valley. Adjacent Snohomish County land is zoned for low–density residential use. Portions of the eastern and southern boundaries adjoin unincorporated King County land which is zoned for agricultural use. On the western boundary of the farm runs Interstate Highway 405; major interchanges are nearby.

In 1973 the owners of the Vitulli farm applied for a rezone to permit the development of a major regional shopping center. During the ensuing months the proposal was considered extensively by Bothell's planning commission and City Council. Numerous public hearings and meetings were held, at which opinions from proponents and opponents of the rezone were voiced. The Bothell Chamber of Commerce voted to support the rezone and did so actively. Both the paid executive director of the Chamber, Ms. Dawson, and a member of its board of directors, Ms. Lovelace, were planning commission members. In September 1974, the planning commission voted to approve the rezone and to supplement the city's comprehensive plan accordingly. The approval was conditioned on execution of

a concomitant agreement between the City and the property owners designed to ensure certain environmental safeguards. The City Council held more hearings and even submitted the proposal to the city voters on an advisory ballot proposition. The majority of voters supported the proposal. In February 1975, the City passed ordinance No. 754 rezoning the Vitulli farm property and supplementing the City's comprehensive plan, both subject to the execution of the concomitant zoning agreement.

Save a Valuable Environment (SAVE), a Washington nonprofit corporation, was formed in November 1974 for the declared purpose of working to maintain the quality of the living environment in the area of the Northshore School District in King and Snohomish counties. This area includes Bothell. SAVE's membership includes residents of Bothell as well as residents of King and Snohomish counties. Many reside in areas immediately adjoining the Vitulli farm. SAVE petitioned the Superior Court for a writ of certiorari to the City of Bothell to review the actions of the planning commission and the City Council, alleging that the rezone will have serious detrimental effects on both the environment and the economy of the area. The judgment entered after trial set aside the zoning action.

Three issues are raised by this appeal. First, does SAVE, a nonprofit corporation, have standing to maintain an action to review a zoning ordinance through a writ of certiorari? Second, was this zoning action illegal spot zoning? Third, was the participation of Ms. Dawson and Ms. Lovelace on the planning commission a violation of the appearance of fairness?

STANDING

We hold that a nonprofit corporation may be a "beneficially interested" party with standing to seek review through a writ of certiorari under RCW 7.16.050, and SAVE does have standing in this case.

The question of standing presented here is whether it is appropriate for a nonprofit corporation, an artificial creature of the law, to represent persons who are threatened with real injury in a legal action. Individuals with a common interest which they seek to further may choose any one of a number of forms through which to act in concert. For example, a labor union, an unincorporated association, may further their interests in their work place and represent those interests in legal actions. *See Boilermakers Local 104 v. International Bhd. of Boilermakers,* 33 Wn.2d 1, 203 P.2d 1019 (1949). The group of people comprising SAVE's membership has chosen the form of a nonprofit corporation. The corporation, acting in a sense as their agent, hired an attorney to present their grievances to the City Council. Having suffered a threat of specific injury by the passage of the ordinance, they now seek to be represented through their corporation in a legal action to have the ordinance set aside.

■ The standing of a nonprofit corporation to challenge government actions threatening environmental damage is firmly established in federal jurisprudence. A basic two–part test for determining whether a corporation has standing was set out in *Association of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 152–53, 25 L. Ed. 2d 184, 90 S. Ct. 827 (1970). The first part of that test, that the interest sought to be protected be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," is easily met in environmental suits because of the abundance of laws affecting use of our natural resources. More troublesome for environmental groups has been the second part of the test, the requirement that the corporation allege the challenged action has caused "injury in fact," economic or otherwise. In practical terms, an organization must show that it or one of its members will be specifically and perceptibly harmed by the action. *United States v. SCRAP,* 412 U.S. 669, 37 L. Ed. 2d 254, 93 S. Ct. 2405 (1973). The standing of a nonprofit corporation to assert its member's

rights, or to act as their representative when direct and specific injury to a member is alleged, was reaffirmed in *Warth v. Seldin,* 422 U.S. 490, 511, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975). It is interesting to note that federal cases do not distinguish between nonprofit corporations and unincorporated associations in determining the standing question. *See Concerned About Trident v. Schlesinger,* 400 F. Supp. 454 (D.D.C. 1975). This lack of concern over the precise form of organization points to the courts' central concern that a specific and perceptible injury to a member of the organization be alleged. An organization whose interest is only speculative or indirect may not maintain an action. *Warth v. Seldin, supra* at 514.[1]

We agree that a nonprofit corporation or association which shows that one or more of its members are specifically injured by a government action may represent those members in proceedings for judicial review. *See Loveless v. Yantis,* 82 Wn.2d 754, 758, 513 P.2d 1023 (1973), citing *Sierra Club v. Morton,* 405 U.S. 727, 31 L. Ed. 2d 636, 92 S. Ct. 1361 (1972), for the proposition that a property owners' association had a sufficiently direct interest to challenge administrative action. This rule is based on practical considerations. An individual who is one of many harmed by an action may be unable to afford the costs of challenging the action himself. A class suit may be too cumbersome. An association or nonprofit corporation of persons with a common interest can then be the simplest vehicle for undertaking the task, and we see no reason to bar injured persons from this method of seeking a remedy. It is argued that a nonprofit corporation without assets may be unable to pay costs assessed against it should it fail in its suit. The same can be said of any individual person, however. It is not

---

[1]Language in *Kemp v. Putnam,* 47 Wn.2d 530, 536, 288 P.2d 837 (1955) may be construed to mean a nonprofit corporation does not have standing absent a showing of direct injury to itself. The facts of that case are distinguishable. Nonetheless, we prefer the federal rule, and to the extent *Kemp* contradicts the holding in this case, it is overruled.

appropriate to bar an injured party from a judicial remedy simply because that party does not have assets.

We adopt the federal approach to the requirements of standing to gain review of this zoning action. We find SAVE has adequately alleged direct and specific harm to its members which would flow from the building of a shopping center near their homes in North Creek Valley.

## ZONING

The central substantive issue presented by this case is whether the action of the City of Bothell in rezoning the Vitulli farm was arbitrary and capricious, constituting illegal spot zoning. The trial court found the rezone could be of benefit to the people of Bothell and the action therefore not arbitrary and capricious. Looking at the issue in the context of the larger community to be affected, however, including North Creek Valley residents outside the city limits, the court found the action would be detrimental and was illegal spot zoning.

The crux of the problem is that construction of a major shopping center would have serious detrimental effects on areas outside Bothell's jurisdiction. Letters from officials of Snohomish and King counties, the Washington Department of Highways, and the Puget Sound Governmental Conference all indicate Bothell's environmental impact statement failed to address serious problems created by the shopping center proposal. First, agricultural and low density residential uses of land around the center could not be maintained. Pressures for secondary business growth would be severe. Not only would desirable agricultural land be lost, but intensified commercial uses would require substantial investments in highways, sewers, and other services and utilities. The economic and aesthetic values of the essentially rural character of the valley would be lost. Second, highway construction requiring millions of dollars of local, state and federal funds would be necessary. Serious increased traffic congestion would create a potentially serious air pollution problem in the valley. It would also, of

course, add substantially to the aesthetic loss. Third, new alignment of the North Creek to accommodate the shopping center, together with anticipated increases in runoff, might create a danger of flooding. Finally, the unstable peat soil on which the center is to be built may settle unevenly, with consequences which have not yet been investigated.

Under these circumstances, Bothell may not act in disregard of the effects outside its boundaries. Where the potential exists that a zoning action will cause a serious environmental effect outside jurisdictional borders, the zoning body must serve the welfare of the entire affected community. If it does not do so it acts in an arbitrary and capricious manner. The precise boundaries of the affected community cannot be determined until the potential environmental effects are understood. It includes all areas where a serious impact on the environment would be caused by the proposed action. The impact must be direct. For example, areas which would experience an increased danger of flooding or air pollution, or areas which would experience pressure to alter the land uses contemplated by their own comprehensive plans, would be part of the affected community.

The trial court found this to be spot zoning. The doctrine of spot zoning has not previously been applied where the adverse effects of the zoning action are felt outside the zoning body's jurisdiction. The rationale of the doctrine, however, is not limited to such boundaries. Spot zoning is zoning with disregard for the welfare of the whole community, for the benefit of a few or in violation of the comprehensive plan. Such action is itself arbitrary and capricious. *See Anderson v. Island County,* 81 Wn.2d 312, 324, 501 P.2d 594 (1972). The doctrine emphasizes the community as a whole and consistency of the rezone with existing land uses. *See Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969). Thus, it does no violence to the doctrine of spot zoning to include within it the action of Bothell challenged here.

We find it unnecessary, however, to classify this action as spot zoning and thereby foreclose the possibility of Bothell's taking further steps to meet the duty we impose. The action was arbitrary and capricious in that it failed to serve the welfare of the community as a whole. Specifically, adverse environmental effects and potentially severe financial burdens on the affected community have been completely disregarded. If it is possible to substantially mitigate or avoid potential adverse environmental effects, and if Bothell takes the necessary steps to do so, responsible planning for the shopping center may be reasonable. It has not acted to avoid these consequences, however, and the rezone cannot be sustained.

We do not hold that a city proposing a rezone which will affect neighboring jurisdictions must engage in interjurisdictional planning. It is clear, however, that such coordinated planning is desirable and might have avoided the result in this case. The City of Bothell received letters from the director of the Snohomish County Planning Department, the director of King County's Department of Budget and Program Planning, the Puget Sound Governmental Conference, and the Washington Department of Highways, all expressing opposition to construction of a major regional shopping center in Bothell. The Puget Sound Governmental Conference and the chairman of the Snohomish County Board of Commissioners urged that the affected jurisdictions work together to evaluate the proposal, particularly in light of two competing shopping centers already planned. Bothell relies on *State ex rel. Pruzan v. Redman,* 60 Wn.2d 521, 374 P.2d 1002 (1962) for the proposition that inviting and receiving comment from neighboring jurisdictions is sufficient consideration of their interests. *State ex rel. Pruzan* did not involve environmental effects as substantial and pervasive as those which will be felt in the North Creek Valley. To the extent that it conflicts with the duty we here impose, however, it is overruled.

The Supreme Court of California, considering the duty of a city to allow development of adequate housing, stated:

When we inquire whether an ordinance reasonably relates to the public welfare, inquiry should begin by asking *whose* welfare must the ordinance serve. In past cases, when discussing ordinances without significant effect beyond the municipal boundaries, we have been content to assume that the ordinance need only reasonably relate to the welfare of the enacting municipality and its residents. But municipalities are not isolated islands remote from the needs and problems of the area in which they are located; thus an ordinance, superficially reasonable from the limited viewpoint of the municipality, may be disclosed as unreasonable when viewed from a larger perspective.

*Associated Home Builders v. Livermore,* 18 Cal. 3d 582, 607, 557 P.2d 473, 487, 135 Cal. Rptr. 41 (1976). Other states also have imposed a duty to serve regional welfare when considering the problem of adequate housing. *Southern Burlington County NAACP v. Mount Laurel,* 67 N.J. 151, 336 A.2d 713 (1975); *Berenson v. New Castle,* 38 N.Y.2d 102, 341 N.E.2d 236, 378 N.Y.S.2d 672 (1975). We find such a duty to exist when the interest at stake is the quality of the environment.

It is the policy of this state, expressed in the State Environmental Policy Act of 1971 "that each person has a fundamental and inalienable right to a healthful environment . . ." RCW 43.21C.020(3). This right has been threatened in the community directly affected by the environmental consequences of Bothell's zoning decision. The welfare of people living in this area must be served.

The City maintains it has fulfilled its duty by the execution of a concomitant zoning agreement by the City and the property owners. This contract requires the developer to take certain steps to ameliorate the adverse environmental and aesthetic effects of construction in Bothell. It recognizes that effects on the region "should be mitigated; within reasonable limits." It does not, however, provide for any specific measures to protect areas outside Bothell. The main concern evidenced is to "mitigate impacts which are

adverse to the environment or the economy of the CITY OF BOTHELL."

In sum, the City has a duty to serve the welfare of the entire affected community when acting on this rezone application and it has failed to do so.

## APPEARANCE OF FAIRNESS

The final issue presented by this case is whether the participation on the planning commission of two persons closely connected with the Bothell Chamber of Commerce, which actively supported the rezone, was a violation of the appearance of fairness. We find that it was.

Ms. Dawson was the paid executive director of the Chamber at the time the planning commission, of which she was a member, considered the Vitulli farm rezone application. Ms. Lovelace, also a member of the planning commission, was on the Chamber's board of directors. The Chamber actively supported the rezone. The trial court found the shopping center would financially benefit most of the Chamber's members and that their support was crucial to the success of the application.

In *Narrowsview Preservation Ass'n v. Tacoma,* 84 Wn.2d 416, 420, 526 P.2d 897 (1974) we held that participation of a planning commission member whose employer has an interest in the outcome is a violation of the appearance of fairness which vitiates the validity of the zoning ordinance. *See also Chicago, M., St. P. & P.R.R. v. State Human Rights Comm'n,* 87 Wn.2d 802, 557 P.2d 307 (1976). The dual roles of Ms. Dawson as commission member and paid director of the Chamber fall squarely within the rule of that case. The Chamber voted to support the rezone; its members stood to gain financially from it. We do not suggest that Ms. Dawson's vote was influenced by the official Chamber position on the rezone. Her position as employee of the Chamber, though, establishes an interest which *might* have substantially influenced her decision. This potential is sufficient to negate the appearance of

impartiality which is crucial to the proper conduct of planning commission proceedings. *See Buell v. Bremerton,* 80 Wn.2d 518, 495 P.2d 1358 (1972).

Similarly, as a member of the Chamber's board of directors, Ms. Lovelace was in a position to be intimately involved with the development and execution of Chamber policy. She did not take part in the Chamber's consideration of, or vote on, the shopping center proposal. Yet again we emphasize the existence of an interest which might have substantially influenced her decision as planning commission member. She was aware of the Chamber's support for the project; from the point of view of a disinterested observer her position on its board of directors might well suggest entangling influences impairing her ability to be impartial. The test to be applied was stated in *Swift v. Island County,* 87 Wn.2d 348, 552 P.2d 175 (1976).

> The question to be asked is this: Would a disinterested person, having been apprised of the totality of a board member's personal interest in a matter being acted upon, be reasonably justified in thinking that partiality may exist? If answered in the affirmative, such deliberations, and any course of conduct reached thereon, should be voided.

*Swift v. Island County, supra* at 361. We find that a disinterested observer would be justified in thinking partiality might exist.

The main thrust of appellant's argument is these ties to the Chamber of Commerce are "associational ties" which are minimal contacts insufficient to violate the appearance of fairness under the rule of *King County Water Dist. 54 v. King County Boundary Review Bd.,* 87 Wn.2d 536, 554 P.2d 1060 (1976). Membership in community and civic organizations is so desirable and common among persons with active community roles, it is suggested, that such membership should as a matter of law be insufficient grounds for finding a violation of the appearance of fairness. We disagree. While it is true that membership in a community organization is protected in some ways by the

First Amendment to the constitution, a rule regarding violations of the appearance of fairness would not burden the right of association, as appellants suggest. The rule does not prohibit membership in community organizations; it prohibits participation in at least quasi–judicial proceedings when such membership demonstrates the existence of an interest which might substantially influence the individual's judgment. Therefore, we hold the zoning ordinance must be set aside for the additional reason that consideration and approval of the matter was vitiated by participation of commission members whose other interests appeared to be capable of substantially influencing their judgment.

Affirmed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, BRACHTENBACH, DOLLIVER, and HICKS, JJ., concur.