# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2018 MAY 29 AM 9: 49

| | | |
|---|---|---|
| PICNIC POINT PRESERVATION COMMITTEE, a Washington non-profit corporation, | ) ) ) ) | No. 76645-7-I |
| Appellant, | ) ) ) | DIVISION ONE |
| and | ) ) | |
| REGATTA ESTATES HOMEOWNERS ASSOCIATION, a Washington non-profit corporation, | ) ) ) ) | UNPUBLISHED OPINION |
| Plaintiff, | ) ) ) | FILED: May 29, 2018 |
| v. | ) ) ) | |
| SNOHOMISH COUNTY, a municipal corporation; and FROGNAL HOLDINGS, LLC, a Washington limited liability company, | ) ) ) ) ) | |
| Respondents. | ) ) ) | |

BECKER, J. — Respondent Snohomish County approved a request by respondent Frognal Holdings LLC to remove a restriction the county had previously imposed against subdividing a large lot that is part of an earlier subdivision. Appellant Picnic Point Preservation Committee filed a land use petition, arguing that the restriction is a covenant that cannot be altered without

the signatures of other owners. Because the restriction is not a covenant, the superior court correctly refused to reinstate the restriction.

## FACTS

In 1992, Shergar Land Corporation submitted the Regatta Estates Plat to Snohomish County for approval. Most of the 78 lots in the Regatta Estates were between 5,000 and 20,000 square feet. Lot 1 was significantly larger at 6.4 acres.

The plat, recorded in February 1996, contained restrictions required by the county. Restriction 9 provided that lot 1 was to be left undeveloped except for a single homesite:

> Lot 1 shall be treated essentially as a native growth protection area [NGPA] provided that a single homesite with access thereto may be developed on said lot. Site development plans for the access driveway and homesite including clearing and revegetation plans and detailed geotechnical analysis will be required to have received approval from the Planning Division prior to the issuance of any site development permits or any disturbance of said Lot.

In May 1996, before conveying any lots, Shergar recorded a Declaration of Covenants, Conditions, Restrictions and Easements (CCRs) for Regatta Estates. The declaration, at section 7.1, stated Shergar's intent to subdivide lot 1 at some point in the future. It also contained a no-protest clause prohibiting lot owners from objecting to subdividing lot 1 in the future if the subdivision complied with "applicable" development regulations:

> With the exception of Lot 1, all lots within the Plat of Regatta Estates are in their final developed size and configuration. Lot 1, however, is an over-sized lot which the Declarant intends, at some time in the future, to subdivide. The owners of Lots in the Plat of Regatta Estates shall take ownership subject to the right of the Declarant and/or its successors to further subdivide Lot 1 pursuant

2

to applicable rules, ordinances or regulations, of the governmental entity regulating development of the same. Accordingly, no lot owner shall have the right to protest and/or object to the Declarant or its Successors efforts to subdivide said real property so long as such subdivision is being requested and/or completed consistent with the rules and regulations of the municipality regulating development at the time of such subdivision.

In 2005, an entity known as Horseman's Trail LLC initiated an application procedure to subdivide lot 1. At some point thereafter, Frognal Holdings acquired lot 1 as well as two adjacent parcels. The three parcels were combined to create a 22.3 acre plot of land designated as Frognal Estates. Frognal planned to subdivide this property into a total of 112 lots, including more than 30 lots on lot 1. To this end, Frognal proceeded with the subdivision application for lot 1 begun by Horseman's Trail. Because this objective would require alteration of the Regatta Estates subdivision of which lot 1 was a part, county approval was necessary. Frognal asked the county to strike restriction 9 from the Regatta Estates plat in connection with its broader request for approval of a new 112 lot subdivision.

The Snohomish County Hearing Examiner held a public hearing on the matter beginning in February 2016. Appellant Picnic Point and the Regatta Estates Homeowners Association opposed the request to strike restriction 9. They argued that restriction 9 was a de facto restrictive covenant prohibiting development of lot 1 unless the application included signatures of other owners who were subject to the 1996 covenants, which it did not. The hearing examiner rejected the argument, ruling that it was unreasonable to expect that lot 1 was

restricted from further development in view of the explicit statement in the CCRs

that the declarant intended to subdivide lot 1 in the future:

> To the extent Preservation Committee argues that restriction 9 requires Lot 1 to be held in perpetuity as a constructive NGPA [Native Growth Protection Area], the restriction cannot be so interpreted. First, no law supports the argument. Second, Lot 1 is clearly not a "legal" NGPA; it did not comply with the NGPA requirements extant at the time of Regatta Estates' establishment, Lot 1 is not marked with signs as an NGPA as required by county code, and by its express terms may be developed with a house and driveway, both of which are incompatible with, and disqualify the lot as an NGPA. The Hearing Examiner's decision approving the preliminary subdivision of Regatta Estates noted "The plat road in Parcel A has been designed to allow its northwesterly extension through proposed Lot 1. . . ." Dedication of a 60 foot wide right of way for a public road through lot 1 was required. Use of the adverb "essentially" signals Lot 1 is not a legal NGPA; the use of the word would have been unnecessary otherwise. Article VII of the Regatta Estates' CCRs contradicts any claimed expectation that Lot 1 would be a constructive NGPA in perpetuity by explicitly stating the declarant's intention to subdivide Lot 1 in the future. Restriction 9 cannot be reasonably read to impress Lot 1 with a constructive NGPA status in perpetuity.

(Footnotes omitted.)

Picnic Point and the Homeowners Association jointly appealed the

decision to the Snohomish County Council. The council affirmed the hearing

examiner's ruling. Picnic Point and the Homeowners Association then appealed

the decision to the Snohomish County Superior Court by filing a petition against

the county and Frognal under the Land Use Petition Act, chapter 36.70C RCW.

The court affirmed the council's decision. Picnic Point now appeals the superior

court's ruling. The Homeowners Association does not join in the appeal.

Picnic Point asks this court to invalidate the alteration of the Regatta Estates plat and to reverse the county's approvals of the applications by Frognal that depend on the plat alteration.

## ANALYSIS

Initially, we deny Frognal's motion to dismiss Picnic Point's appeal for lack of standing.

Standing to bring a land use petition is limited by statute to certain types of entities. RCW 36.70C.060. In the trial court, Frognal moved to dismiss both Picnic Point and the Homeowners Association for lack of standing. The trial court denied this motion and ruled that both entities had standing. The respondents did not appeal this ruling.

This court "will grant a respondent affirmative relief by modifying the decision which is the subject matter of the review only (1) if the respondent also seeks review of the decision by the timely filing of a notice of appeal or a notice of discretionary review, or (2) if demanded by the necessities of the case." RAP 2.4(a). Frognal does not argue that the requirements of RAP 2.4(a) have been satisfied.

Picnic Point claims associational standing. Frognal asserts that the Homeowners Association never had standing to begin with and therefore by extension, Picnic Point never had associational standing.

An association has standing to sue as long as one of its members would have standing. Save a Valuable Environment v. City of Bothell, 89 Wn.2d 862, 866-68, 576 P.2d 401 (1978). Because the Homeowners Association is a

5

member of Picnic Point, at a minimum, Picnic Point has standing to represent the interests of the association. The trial court's ruling denying Frognal's motion to dismiss for lack of standing was soundly based on this principle. Frognal does not provide a basis to disturb that ruling.

Citing RAP 3.1, the county argues that Picnic Point is precluded from seeking appellate review. According to the county, Picnic Point is not an aggrieved party because its own rights and interests are not affected by the alteration of the Regatta Estates plat. The county argues that Picnic Point does not have associational standing on appeal because the association did not join in the appeal. But the county does not explain why the Homeowners Association, a member of Picnic Point, would need to join in the appeal to have its interests represented on appeal by Picnic Point. Because Picnic Point has a member that is affected by the land use decision, Picnic Point has the status of an aggrieved party under RAP 3.1.

Turning to the merits of Picnic Point's appeal, we review the superior court's decision under RCW 36.70C.030. Picnic Point seeks relief on grounds that

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
> . . . .
> (d) The land use decision is a clearly erroneous application of the law to the facts.

RCW 36.70C.130(1).

The "law" that the hearing examiner interpreted and applied is a statute regulating subdivisions. It requires the signatures of "all parties subject to the

covenants" before a subdivision may be altered in a way that would violate a covenant filed when the subdivision was approved. "When any person is interested in the alteration of any subdivision or the altering of any portion thereof . . . that person shall submit an application to request the alteration to the legislative authority of the city, town, or county where the subdivision is located. . . . If the subdivision is subject to restrictive covenants which were filed at the time of the approval of the subdivision, and the application for alteration would result in the violation of a covenant, the application shall contain an agreement signed by all parties subject to the covenants." RCW 58.17.215. The Snohomish County Code sets forth nearly identical requirements in SCC 30.41A.710(2).

Picnic Point contends that Frognal's proposed alterations to lot 1 would violate restriction 9 of the Regatta Estates Plat. A dispositive question, then, is whether restriction 9 is a restrictive "covenant" as that term is used in RCW 58.17.215. If so, alteration of lot 1 violates a covenant and cannot be approved if it does not contain an agreement signed by all parties subject to the covenants.

The restrictions on the Regatta Estates Plat, including restriction 9, are not, strictly speaking, covenants. Rather, they are restrictions on the face of the plat imposed by the county. Picnic Point asks us to interpret the declaration as incorporating restriction 9 as a de facto covenant.

Covenants are interpreted in the same manner as contracts. Hollis v. Garwall, Inc., 137 Wn.2d 683, 696, 974 P.2d 836 (1999). "The interpretation of

7

language contained in a restrictive covenant is a question of law for the court."
Green v. Normandy Park, 137 Wn. App. 665, 681, 151 P.3d 1038 (2007), review denied, 163 Wn.2d 1003 (2008). Our primary objective in this analysis is to determine the intent or purpose of the covenant. Hollis, 137 Wn.2d at 696.

Picnic Point's claim that restriction 9 is a de facto covenant relies on the recital in Shergar's declaration for the CCRs for the plat of Regatta Estates. The recital declares that all of the lots within the plat are subject to restrictions recorded on the face of the plat:

> NOW, THEREFORE, Declarant hereby declares that all of the lots within the Plat of Regatta Estates shall be held, sold and conveyed subject to and together with the following easements, restrictions, covenants and conditions together with the restrictions (etc.) recorded on the face of the Plat, all of which are for the purpose of enhancing and protecting the value, desirability and attractiveness of the real property.

The hearing examiner's analysis, on the other hand, focused on the operative language in section 7 of Shergar's declaration, stating that lot 1 was intended for subdivision at sometime in the future.

As a general rule, recitals or preambles in contracts may be resorted to in aid of construction only when there is an ambiguity in the operative portion of the agreement. Sethre v. Wash. Educ. Ass'n, 22 Wn. App. 666, 670, 591 P.2d 838, review denied, 92 Wn.2d 1020 (1979). But when the language of the recital or preamble states a promise, it is interpreted as if it were an operative term of the contract. "The essential feature of a contract is the promise, and whenever the court can collect from the instrument an agreement to do or not to do a certain thing, it amounts to a covenant, whether it be contained in the recital or in any

8

other part of the instrument.'" Sethre, 22 Wn. App. at 670, quoting First Nat'l Bank & Trust Co. v. United States Trust Co., 184 Wash. 212, 219, 50 P.2d 904 (1935). In Sethre, the court found that past iterations of a pension plan for staff employees in the public schools had long contained a preamble promising that benefits for staff would be substantially the same as for teachers. Because teachers were entitled to pensions with a 2 percent benefit formula, the court held that retired staff employees were also entitled to a 2 percent formula, rather than the 1 percent formula stated in a recent change in the plan. Sethre, 22 Wn. App. at 670. The variance between the preamble and the operative portions of the plan created an ambiguity that allowed the court to consider other evidence. Sethre, 22 Wn. App. at 670.

Applying Sethre to the present case, we can agree that the declaration as a whole is ambiguous. The preliminary recital declaring that all of the lots in the Regatta Estates plat (including lot 1) are subject to the restrictions on the face of the plat arguably is a term incorporating restriction 9 into the declaration as a restrictive "covenant" for purposes of RCW 58.17.215, a statute that was in effect in 1996 in the same form as today. See LAWS OF 1987, ch. 354 § 4. But that is not the only possible interpretation of the declaration taken as a whole. The recital conflicts with the more explicit statements in section 7.1. That section not only states that Shergar intended to subdivide lot 1 sometime in the future, it also states that "no lot owner shall have the right to protest and/or object to the Declarant or its successors efforts to subdivide said real property." That no-protest clause would be of no effect if a lot owner had the ability to prevent the

subdivision of lot 1 simply by withholding the signature required by RCW 58.17.215.

Picnic Point responds that section 7.1 is not a blanket no-protest clause and it does not conflict with restriction 9 because it bars objection only if resubdivision of lot 1 is "consistent with the rules and regulations of the municipality regulating development at the time of such subdivision." According to Picnic Point, the relevant rules and regulations are those found in RCW 58.17.215 and the similar county ordinance, requiring signatures of other owners as a precondition to altering the plat in a way that would violate a covenant. This argument is circular. Again, if the declarant intended to make the signatures of other owners a prerequisite for subdividing lot 1, the declarant would not have inserted the explicit no-protest clause with respect to lot 1.

When there is an inconsistency between a general and a specific provision, such as the declaration's general recital and the specific language of section 7.1, specific language ordinarily prevails over more general terms. Mayer v. Pierce County Med. Bureau, Inc., 80 Wn. App. 416, 423, 909 P.2d 1323 (1995); McGary v. Westlake Inv'rs, 99 Wn.2d 280, 286, 661 P.2d 971 (1983). The clarity of the declarant's specific intent stated in section 7.1, as compared to the vaguer and more general language of the recital, persuades us that the hearing examiner's interpretation accurately reflects the intent and purpose of the declaration. As the hearing examiner noted in his conclusions of law, "Lot 1 was always intended to be subdivided and Regatta Estates homeowners had notice of that intention." We conclude that restriction 9 was not intended to be a

10

restrictive covenant that could not be altered without the signed agreement of other parties subject to the covenant. The decision allowing restriction 9 to be stricken from the Regatta Estates plat was not clearly erroneous.

Respondents request attorney fees on appeal under RCW 4.84.370. Picnic Point requests the opportunity to brief the issue of entitlement to attorney fees on appeal once the appeal has been decided, but there is no authority permitting that sort of piecemeal briefing. Because the respondents properly requested an award of attorney fees in their respective briefs as required by RAP 18.1(a) and (b), and Picnic Point shows no reason why RCW 4.84.370 does not apply in these circumstances, the request of the respondents is granted.

The motion to dismiss the appeal is denied. The superior court's decision is affirmed.

Becker, J.

WE CONCUR:

Mann, A.C.J.

Cox, J.

11