[No. 63466-6-I. Division One. March 29, 2010.]

MAGNOLIA NEIGHBORHOOD PLANNING COUNCIL, *Respondent*, v.
THE CITY OF SEATTLE, *Appellant*.

306

*Peter S. Holmes*, City Attorney, and *Roger D. Wynne, Assistant*, for appellant.

*John R. Neeleman* and *Gwendolyn C. Payton* (of *Lane Powell PC*), for respondent.

¶1 GROSSE, J. — When the city of Seattle (City) approves a plan for a specific construction project in a defined geographic area that involves a decision to purchase, sell, lease, or transfer publicly owned land, this undertaking is a "project action" subject to review under the State Environmental Policy Act (SEPA), chapter 43.21C RCW. Here, the City sought to obtain federal property being disposed of under the Defense Base Closure and Realignment Act of 1990 (BRAC), 10 U.S.C. section 2687. As part of this process, the City approved a plan for residential development of the property, which will bind the City's use of the

property upon federal approval. Thus, the trial court correctly concluded that the City's development plan constituted a project action that is subject to SEPA compliance. But the trial court lacked authority to order the City to publicly determine the applicability of an earlier "master plan" for Discovery Park because the master plan did not create any enforceable rights or duties and SEPA does not authorize such a "public determination" requirement. Accordingly, we affirm in part and reverse in part.

## FACTS

¶2 In 1972, after deciding to close Fort Lawton, federal military property located in the Magnolia neighborhood of Seattle, now known as Discovery Park, the federal government conveyed the majority of the property to the City. The City proposed a plan for its reuse, the the "Fort Lawton Master Plan" (FL Master Plan), which devoted most of the property for park purposes. The federal government retained a portion of the property used by the Army Reserve, known as the Army Reserve Center (ARC).

¶3 In 1974, the City revised the FL Master Plan as the "Discovery Park Master Plan" (DP Master Plan). In 1980, the City approved a process to revise and update the 1974 plan. This process required that the "Department of Parks and Recreation will complete environmental review processes on proposed revisions to the Discovery Park Master Plan." In 1986, the City revised the DP Master Plan. The revised plan stated that it was "intended that all features and policies of the November 1972 and February 1974 Plans shall be part of the Plan for Discovery Park except where herein revised."

¶4 Around 2006, the United States Department of Defense (DOD) decided to close ARC because it was no longer needed for military purposes. The federal government proceeded with the closure under BRAC, which required it to

select a local redevelopment authority (LRA) that would receive the property and prepare a plan for its development.[1] The City sought and received approval as the designated LRA for the ARC property. The City then began the process for approving a redevelopment plan, which is required under BRAC and must be submitted for federal approval.[2]

¶5 The City's plan, known as the "Fort Lawton Redevelopment Plan" (FLRP) was for construction of a housing community that included "a new mixed-income neighborhood" with "between 108 and 125 market-rate units; a 55-unit building for homeless seniors; 30 units for homeless families; and six self-help ownership units to be developed by Habitat for Humanity." The plan further stated that the "income source for the project will be the sale of single family and duplex townhome lots to market-rate developers."

¶6 As part of the process for its approval of the FLRP, the City also had to amend its citywide "Comprehensive Plan" to change the land use designation for the ARC property from single-family to multifamily. In doing so, the City prepared an "Environmental Checklist" and "Threshold Determination" as required under SEPA, and identified possible environmental impacts from the development of the ARC property. In its checklist, the City identified possible environmental impacts from the development of the ARC property and stated that the project would be subject to SEPA review:

> The proposed map change could indirectly lead to increased development activity and associated potential short-term construction impacts on air quality. If the City as the Designated Local Reuse Authority, selects a project proposal for the Fort Lawton site, that project will be subject to SEPA review.

The checklist also addressed "Future Land Use Map change related to Fort Lawton" and stated, "The proposed map

---

[1] *See* Pub. L. No. 101-510, § 2910(9), (10) (1990) (codified at 10 U.S.C. § 2687 note); 32 C.F.R. § 174.3(g); Pub. L. No. 101-510, § 2905(a)(7)(F)(i), (G)(i) (codified at 10 U.S.C. § 2687 note).

[2] *See* Pub. L. No. 101-510, § 2905(a)(7)(F)(i), (G)(i).

change could indirectly lead to the conversion of a federal facility into a project providing housing and services to homeless people. That project will be subject to environmental review under SEPA."

¶7 In September 2008, the City finalized the FLRP and the city council passed Resolution 31086, which adopted and approved the FLRP. But the City indicated that it would delay SEPA compliance until it actually applied for rezoning or land use permits, stating:

SEPA is the responsibility of the local jurisdiction, in this case, the City of Seattle. SEPA is triggered by certain land use actions, including the request for a rezone or for development permits for projects over a specific size threshold (typically 20 units). SEPA determinations are made at the time of application for rezone or land use permit.

¶8 In October 2008, a neighborhood community organization, the Magnolia Neighborhood Planning Council (Magnolia), sued the City, challenging its adoption of the FLRP as violating SEPA. Magnolia sought a declaratory judgment that the City failed to conduct required SEPA review of the plan and that the FLRP was inconsistent with the 1986 DP Master Plan. Both parties moved for summary judgment based on an agreed record. The trial court granted summary judgment in part for Magnolia and ordered:

Ordinance 31086 which adopted the Fort Lawton Redevelopment Plan is declared void and without effect, unless and until: a) the City fully complies with all requirements of the State Environmental Policy Act; and b) the City publicly determines whether the [DP] Master Plan applies to the Army Reserve Center property and, if not, why not.

The City appeals.

## ANALYSIS

### I. Standing

¶9 The City first contends that Magnolia lacks standing to assert a SEPA claim because its claimed injuries are

speculative and its interests "are outside the zone" protected by SEPA and the 1986 DP Master Plan. We disagree.

■ ¶10 "The standing of a nonprofit corporation to challenge government actions threatening environmental damage is firmly established in federal jurisprudence," and our courts have adopted the federal approach.[3] To establish standing, a party must (1) show that the interest sought to be protected is " 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question,' " and (2) "allege [that] the challenged action has caused 'injury in fact,' economic or otherwise."[4] The trial court ruled that Magnolia had standing, citing *Save a Valuable Environment v. City of Bothell* (*SAVE*).[5] In *SAVE*, the court held that an environmental organization had standing to challenge the city of Bothell's zoning action that would permit the building of a shopping center when the organization's members lived near the project site and alleged harm to their property that would flow from the project.[6]

¶11 The City contends that Magnolia's allegations of harm are speculative because they depend on "rank speculation about future federal government and City action." The City asserts that it lacks legal authority to dictate future uses of the ARC property, noting that the FLRP is still subject to federal approval and the City's LRA application could be rejected. But this is an argument directed to the merits, i.e., whether the SEPA exemption for nonproject actions subject to federal approval applies, rather than an argument against standing, and as discussed below, the SEPA exemption does not apply here. Applying relevant standing law, the trial court correctly concluded that Mag-

---

[3] *Save a Valuable Environment v. City of Bothell*, 89 Wn.2d 862, 866, 576 P.2d 401 (1978) (*SAVE*).

[4] *SAVE*, 89 Wn.2d at 866 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152-53, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970)).

[5] 89 Wn.2d 862, 576 P.2d 401 (1978).

[6] 89 Wn.2d at 868.

nolia has established standing: it is a party representing interests of those owning property adjacent to a City-proposed project and who allege that the project will injure their property without SEPA review.[7]

II. <u>SEPA Review</u>

■■ ¶12 The City contends that even if Magnolia had standing to sue the City for SEPA violations, the trial court erred by ruling that as a matter of law the FLRP is subject to SEPA review. We disagree.

¶13 SEPA applies to the actions of the City as defined in WAC 197-11-704, which provides:

(1) "Actions" include, *as further specified below*:

(a) New and continuing activities (including projects and programs) entirely or partly financed, assisted, conducted, regulated, licensed, or approved by agencies;

(b) New or revised agency rules, regulations, plans, policies, or procedures; and

(c) Legislative proposals.

(2) Actions fall within one of two categories:

(a) **Project actions.** A project action involves a decision on a specific project, such as a construction or management activity located in a defined geographic area. Projects include and are limited to agency decisions to:

(i) License, fund, or undertake any activity that will directly modify the environment, whether the activity will be conducted by the agency, an applicant, or under contract.

(ii) Purchase, sell, lease, transfer, or exchange natural resources, including publicly owned land, whether or not the environment is directly modified.

---

[7] *See SAVE*, 89 Wn.2d at 866, 868 (recognizing that the first part of the standing test "is easily met in environmental suits because of the abundance of laws affecting use of our natural resources," and concluding that an environmental organization adequately alleged harm to its members that would flow from a construction project near their homes); *see also Lemon v. Geren*, 379 U.S. App. D.C. 403, 514 F.3d 1312 (2008) (residents had standing to challenge BRAC transfer of base property to developer and assert National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321, 4331-4335, 4341-4347, violations).

(b) **Nonproject actions.** Nonproject actions involve decisions on policies, plans, or programs.

(i) The adoption or amendment of legislation, ordinances, rules, or regulations that contain standards controlling use or modification of the environment;

(ii) The adoption or amendment of comprehensive land use plans or zoning ordinances;

(iii) The adoption of any policy, plan, or program that will govern the development of a series of connected actions (WAC 197-11-060), but not including any policy, plan, or program for which approval must be obtained from any federal agency prior to implementation;

(iv) Creation of a district or annexations to any city, town or district;

(v) Capital budgets; and

(vi) Road, street, and highway plans.

WAC 197-11-704.

¶14 The City argues that the approval of the FLRP as part of its LRA application to the federal government is expressly excluded from this definition of "action" as set forth in subsection (2)(b)(iii). The City asserts that it is a "policy, plan, or program that will govern the development of a series of connected actions . . . for which approval must be obtained from any federal agency prior to implementation" because it will not be implemented unless federal agencies approve the application.

¶15 But as the trial court correctly concluded, the FLRP more appropriately falls under the definition of "project actions" as set forth in subsection (2)(a)(ii). It is not simply a plan, program, or policy as the City suggests, but a decision on a specific construction project, located in a defined geographic area. It is also an agency decision to purchase, sell, lease, transfer, or exchange publicly owned land because the plan is to develop the property into market rate housing.

¶16 The City's attempt to characterize the FLRP as a "series of connected actions" to fall within subsection (2)(b)(iii) is unavailing. The types of "connected actions"

contemplated by this exemption are nonproject actions, i.e., those that do not fall within subsection (2)(a), which applies to actions involving a "decision on a specific project, such as a construction or management activity located in a defined geographic area."[8] As discussed above, the City's approval of the FLRP fits squarely within this category. The separate "connected actions" the City identifies are nothing but parts of this project action to develop the ARC property; they do not somehow transform the FLRP into a nonproject action.[9]

¶17 The City also relies on language in WAC 197-11-060, which is cited in subsection (2)(b)(iii) where it refers to "a series of connected actions."[10] The City cites language in WAC 197-11-060 referring to proposals "related to each other closely enough to be, in effect, a single course of action" that must be considered together under SEPA if they "are interdependent parts of a larger proposal and depend on the larger proposal as their justification or for their implementation," and contends that "the LRA application brings together proposals on a range of interrelated disposal actions that the United States Department of Housing and Urban Development and DOD must consider and balance as a package."[11] But the language the City cites is just part of the referenced WAC section.[12] That WAC section also refers to "public or nonproject proposals" that "should be described . . . in terms of objectives," and gives examples such as " 'reducing flood damage and achieving better flood control by one or a combination of the following

---

[8] WAC 197-11-704(2)(a); *see* WAC 197-11-704(2) (specifying that "[a]ctions fall within one of two categories," either project actions or nonproject actions).

[9] The City asserts that these "connected actions" include "expanding a park, constructi[ng] market-rate and self-help housing, implementing a financing scheme to provide assistance to the homeless, altering site access and circulation, disposing federal personal property, and outlining government actions needed for implementation."

[10] WAC 197-11-704(2)(b)(iii) (stating, "[t]he adoption of any policy, plan, or program that will govern the development of a series of connected actions (WAC 197-11-060) . . .").

[11] WAC 197-11-060(3)(b).

[12] The City cites only language from subsection (3)(b) of WAC 197-11-060.

means: Building a new dam; maintenance dredging; use of shoreline and land use controls; purchase of floodprone areas; or relocation assistance.' "[13] Thus, this section contemplates "big picture" policies that might involve a series of actions over time to accomplish the objective, not single project actions such as the housing construction project proposed in the FLRP. Contrary to the City's contentions, WAC 197-11-060 does not define "a series of connected actions" to include projects such as the FLRP and, in fact, does not define this term at all.

■■ ¶18 The City further contends that its approval of the FLRP is not an "action" because it was adopted only by resolution, not by ordinance, and there is a possibility that the City might not follow through with the intent stated in the FLRP. But, as Magnolia contends, our courts have recognized that environmental review can be required even when the government has not made a definite proposal for actual development of the property at issue. In *King County v. Washington State Boundary Review Board (Black Diamond)*, the court held that the city's annexation decision was subject to SEPA requirements even though there was no definite proposal for actual development of the annexed property, recognizing that "[t]he absence of specific development plans should not be conclusive of whether an adverse environmental impact is likely."[14] As the court explained:

> One of SEPA's purposes is to provide consideration of environmental factors at the earliest possible stage to allow decisions to be based on complete disclosure of environmental consequences. . . . Even if adverse environmental effects are discovered later, the inertia generated by the initial government decisions (made without environmental impact statements) may carry the project forward regardless. When government decisions may have such snowballing effect, decisionmakers

---

[13] WAC 197-11-060(3)(a)(iii).

[14] 122 Wn.2d 648, 663, 860 P.2d 1024 (1993).

need to be apprised of the environmental consequences *before* the project picks up momentum, not after.[15]

The court then concluded:

> We therefore hold that a proposed land use related action is not insulated from full environmental review simply because there are no existing specific proposals to develop the land in question or because there are no immediate land use changes which will flow from the proposed action.[16]

¶19 Likewise here, the proposed land use related action approved in the FLRP does not evade SEPA review simply because the approval of the FLRP does not result in immediate land use changes. Indeed, as Magnolia argues, this is precisely the type of government decision that would have the "snowballing effect" described in *Black Diamond* if pushed through the LRA application process without SEPA review.[17] Additionally, as Magnolia points out, the FLRP is actually more precise and definite than the plan at issue in *Black Diamond*. In *Black Diamond*, there was no pending development proposal other than a preferred use as " '[s]ingle family residential' " or " 'Residential/Golf Course Community.' "[18] But here, the proposal in the FLRP was very detailed and included the number of residential units approved, the layout of the uses, and information indicating potential environmental impacts. Additionally, the City's approval of the FLRP has a greater binding effect than the annexation decision in *Black Diamond*; as the parties acknowledged at oral argument, once adopted by the federal government as a condition of transfer of the ARC property, it will bind the City as to its use of that property.

---

[15] *Black Diamond*, 122 Wn.2d at 663-64.

[16] *Black Diamond*, 122 Wn.2d at 664.

[17] As Magnolia points out, "[i]f the DOD approves the plan, then the ARC property will be deeded to the City and will be required to conform to the FLRP. Later environmental review is likely to be little more than lip service given that the decision about the kind, type, and extent of the development was made when the City Council approved the FLRP."

[18] 122 Wn.2d at 656.

■ ¶20 The City further argues that even if the FLRP is an "action" within the meaning of SEPA, it is an action that is categorically exempt from SEPA review under WAC 197-11-310(1), which provides, "A threshold determination is required for any proposal which meets the definition of action and is not categorically exempt." The City contends that the FLRP is categorically exempt as a "purchase or acquisition of any right to real property" under WAC 197-11-800(5)(a) and as a "sale, transfer or exchange of any publicly owned real property" that "is not subject to an authorized public use" under WAC 197-11-800(5)(b). But as Magnolia points out, the City's approval of the FLRP is not simply the acquisition of real property. Rather, it involves the acquisition of "publicly owned land" and is an "activit[y] . . . entirely or partly financed, assisted, conducted, regulated, licensed, or approved by agencies," making it a project action under WAC 197-11-704(1)(a).

III. Preemption

■ ■ ¶21 To the extent the City makes a federal preemption argument, it is without merit.[19] As Magnolia correctly concludes, the City fails to establish that, by the passage of BRAC, Congress has conveyed an intent to preempt local SEPA law. Federal preemption is required only when Congress conveys an intent to preempt local law by

> (1) "express preemption," where Congress explicitly defines the extent to which its enactments preempt laws; (2) "field preemption," where local law regulates conduct in an area the federal government intended to exclusively occupy; and (3) "conflict preemption," where it is impossible to comply with both local and federal law.[20]

---

[19] The City asserts that to not apply the exemption in subsection (2)(b)(iii) here would necessarily result in federal preemption.

[20] *City of Seattle v. Burlington N. R.R.*, 145 Wn.2d 661, 667, 41 P.3d 1169 (2002).

¶22 The City has identified no express preemption in either BRAC or the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321, 4331-4335, 4341-4347. In fact, the federal regulations implementing BRAC indicate an intent not to interfere with local laws. 32 C.F.R. section 174.6(b) provides:

> The LRA should focus primarily on developing a comprehensive redevelopment plan based upon local needs. The plan should recommend land uses based upon an exploration of feasible reuse alternatives. If applicable, the plan should consider notices of interest received under a base closure law. *This section shall not be construed to require a plan that is enforceable under state and local land use laws, nor is it intended to create any exemption from such laws.*[21]

¶23 Nor has the City established that this is an area that the federal government intended to exclusively occupy. Rather, Congress has anticipated that NEPA work in conjunction with analogous state laws[22] and the City cites nothing in BRAC that states or suggests that surplusing military bases requires anything different. Indeed, in amending federal regulations governing the BRAC process the DOD explicitly recognized:

> The rule does not have federalism implications because it will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government. The only role the rule assigns to state or local government is for the establishment of an LRA and that action is entirely voluntary on the part of local government and explicitly provided for in the base closure laws. This rule does not change the relationship between the

---

[21] (Emphasis added.)

[22] *See* 40 C.F.R. 1506.2(c) ("Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.").

Federal Government and state or local government nor does it change the distribution of power between those entities.[23]

¶24 Finally, the City has failed to establish a conflict between SEPA and NEPA because SEPA does not make compliance with NEPA impossible under BRAC. The adopted regulations for NEPA fully recognize that many states have environmental review statutes, some almost analogous to NEPA in content, and require recognition and consistency with local regulations, not preemption:

> **Agencies shall cooperate** with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. . . .
>
> . . . .
>
> . . . Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal **agencies shall cooperate** in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.[24]

¶25 The City relies on federal case law holding that federal judicial review of BRAC decisions is limited.[25] But none of these cases addressed the applicability of state Environmental Protection Act laws to LRA applications made under BRAC and do not support the City's argument. Rather, all of these cases involved challenges made by state elected officials to base closure/realignment decisions made under BRAC and held that the BRAC determinations to close or realign certain bases were not subject to judicial review because the BRAC's purpose, structure, and text

---

[23] Revitalizing Base Closure Communities and Addressing Impacts of Realignment, 71 Fed. Reg. 9910, 9919 (Feb. 28, 2006) (addressing Amendments to 32 C.F.R. parts 174, 175, and 176).

[24] 40 C.F.R. § 1506.2(b), (c) (emphasis added).

[25] *See Blagojevich v. Gates*, 558 F. Supp. 2d 885 (C.D. Ill. 2008); *Bredesen v. Rumsfeld*, 500 F. Supp. 2d 752 (M.D. Tenn. 2007); *Gregoire v. Rumsfeld*, 463 F. Supp. 2d 1209 (W.D. Wash. 2006); *Corzine v. 2005 Defense Base Closure & Realignment Comm'n*, 388 F. Supp. 2d 446 (D.N.J. 2005).

manifest congressional intent to limit judicial review.[26] There, the courts relied on the express language of the BRAC that provides for judicial review only in the limited context of NEPA objections, the BRAC's provisions for executive and congressional review, and its directive to confine the base-closing selection process within a narrow time frame.[27]

¶26 The City argues that likewise here, judicial review of the City's LRA application is precluded, noting that the "deadline-driven" directives of BRAC do not accommodate additional SEPA review. But Magnolia is not seeking review of the City's LRA application or a determination made by a federal agency under BRAC. It is seeking judicial review of the City's failure to comply with state law under SEPA before approving the plan to be submitted in its LRA application. Indeed, as the City continually points out, no federal action has even been taken on the City's LRA application. The City's reliance on these cases is therefore misplaced.

## IV. Applicability of the Discovery Park Master Plan

¶27 The City also challenges the trial court's ruling that the City was required to publicly determine the applicability of the DP Master Plan to the FLRP, contending that this ruling was without legal basis. The City asserts that the DP Master Plan created no enforceable right or duty and that there was no legal authority for the trial court's "public determination" requirement. We agree.

---

[26] *See Blagojevich*, 558 F. Supp. 2d at 886 (challenge by governor to BRAC determination to realign state air guard and redistribute air guard aircraft); *Gregoire*, 463 F. Supp. 2d at 1216 (challenge by governor to BRAC recommendation to realign air force base and state air guard); *Bredesen*, 500 F. Supp. 2d at 754 (challenge by governor to BRAC recommendation to realign state air guard); *Corzine*, 388 F. Supp. 2d at 447 (challenge by elected state officials and military personnel to base closure).

[27] *See Corzine*, 388 F. Supp. 2d at 450-51; *Gregoire*, 463 F. Supp. 2d at 1221-23; *Bredesen*, 500 F. Supp. 2d at 759-763; *Blagojevich*, 558 F. Supp. 2d at 889-91.

¶28 The trial court ruled as follows:

The City, obviously, wants me to say the Master Plan has no application and the petitioner wants me to say the City has not considered the Master Plan as it must. Here's what I think. The City must at least explain why it's not considering the Master Plan. There is enough here in the Master Plan to indicate that the Army Reserve was thought of as part of the nonpark uses within the Plan. No one contemplated as it appeared in 1972, 1974 or 1986, and why would they, that this particular nonpark use would ever become a potential park use. They thought the Army [R]eserve was going to stay there. But having said that, it seems to me that at a minimum, the City at least has to make a determination and it has to do it publicly, about whether or not the Master Plan applies to the ARC property and if not, why not. Then I think the remedies will be political and not legal. Because it's clear from the case law, although master plans have some sort of general shaping effect, if you will, that they do not tie the hands of an agency that makes, for example, contrary zoning decisions. There is a need here, however, for the City to acknowledge the Plan and talk about why it does or does not apply to what the City wants to do with the ARC property.

So I'm granting the petitioner's motion in part with regards to the Master Plan, but not in total because I don't believe that I can find a violation here of the Master Plan, nor do I think I should.

¶29 As support for the court's ruling, Magnolia cites case law recognizing that "any proposed land use decision must generally conform with the comprehensive plan" and asserts that the City must consider the DP Master Plan as the comprehensive plan.[28] Magnolia further asserts that the legal basis for the court's ruling was SEPA because the City must consider the DP Master Plan in considering alternatives under SEPA.

¶30 The City is correct that there is no legal basis for the court's "public determination" requirement. The case law cited by Magnolia does not impose such a requirement—it simply recognized that proposed decisions must generally

---

[28] *Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 873, 947 P.2d 1208 (1997).

conform with the comprehensive plan.[29] Nor does SEPA impose such a requirement. Indeed, the court did not cite any legal basis for this requirement and instead recognized that the FLRP's conformance with the master plan was not something it should rule on and that "the remedies will be political and not legal."

### V. Fees

¶31 Magnolia requests fees under RCW 4.84.370, which provides:

> [R]easonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals or the supreme court of a decision by a county, city, or town to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit, site plan, or similar land use approval or decision.

While the City contends that this statute applies only to a decision on a land use permit, which was not at issue here, the FLRP does amount to a "similar land use approval or decision," which also falls within the statute. But because Magnolia is not the prevailing party on all of the issues on appeal, it is not entitled to fees.

¶32 We affirm the trial court's order on the applicability of SEPA, reverse the trial court's order requiring the City to publicly determine the applicability of the DP Master Plan, and deny Magnolia's request for attorney fees.

BECKER and LEACH, JJ., concur.

After modification, further reconsideration denied May 14, 2010.

---

[29] *See Citizens for Mount Vernon*, 133 Wn.2d at 873.