FILED
COURT OF APPEALS
DIVISION II

2013 SEP 17 AM 8: 38

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| THE LANDS COUNCIL, | No. 43158-1-II |
| Appellant/Cross-Respondent, | |
| v. | |
| WASHINGTON STATE PARKS & RECREATION COMMISSION, | PUBLISHED OPINION |
| Respondent/Cross-Appellant, And | |
| MOUNT SPOKANE 2000, | |
| Intervenor. | |

BJORGEN, J. — The Lands Council, a private organization, appeals the superior court's grant of summary judgment[1] in favor of the Washington State Parks and Recreation Commission (Commission) on the Lands Council's claim that the Commission improperly classified 279 acres of Mount Spokane State Park without preparing an Environmental Impact Statement (EIS). The Commission cross appeals the superior court's conclusion that the Lands Council had standing. We hold that the Lands Council had standing and that the Commission violated the State Environmental Policy Act (SEPA)[2] by taking this action without preparing an EIS. Accordingly, we affirm in part and reverse in part.

---

[1] The trial court action that is appealed is denominated an order of dismissal, but its terms make clear that it is an order of summary judgment.

[2] Chapter 43.21C RCW.

No. 43158-1-II

FACTS

A.    THE NATURE AND HISTORY OF THE PROPOSAL

The Commission is responsible for managing state park land and using that land to provide recreation to Washington residents. Mount Spokane State Park encompasses about 14,000 acres and supports a variety of year-round recreational activities. Mount Spokane 2000 (MS 2000) is a nonprofit ski resort, which has leased 2,300 acres of land from the state since 1951. MS 2000 has developed 1,450 acres of its leased land as an alpine ski facility, leaving 850 undeveloped acres. The undeveloped acres are known as the potential alpine ski expansion area (PASEA).

In 2008, MS 2000 submitted a conceptual plan to develop most of the 850 acres in the PASEA, but later abandoned that plan. In August 2010, the Commission prepared a facilities master plan, but because MS 2000 was no longer pursing its 2008 plan, the master plan did not classify the PASEA.[3] In December 2010, MS 2000 submitted a new conceptual plan for the PASEA. Under this plan, ski runs would be developed over 279 acres, with the remaining 571 acres in the PASEA left in a natural condition and used for lower impact activities such as snowshoeing. The Commission agreed to address both the PASEA classification for the 850 acres and MS 2000's development concept for the 279 acres at its May 2011 meeting.

In preparation for the May meeting, commission staff prepared a PASEA management classification plan, which considered a number of scenarios, including authorizing no development, authorizing different levels of low impact activities, and authorizing the proposed

_____

[3] The Commission uses six land classifications, which either authorize high, medium, or low intensity recreational activities or limit land to preservation. The six classifications include recreation, resource recreation, natural, heritage, natural forest, and natural area preserves.

2

ski run expansion in a portion of the PASEA. The commission staff also provided MS 2000 with an environmental checklist under SEPA, which incorporated several environmental reports and analyses from the 2010 master planning process. After the commission staff reviewed the completed environmental checklist, it determined that a mitigated determination of nonsignificance (MDNS)[4] was appropriate under SEPA for both MS 2000's concept and the management classifications proposed for commission adoption. The MDNS for the conceptual plan included the condition that MS 2000 prepare an EIS and a Supplemental EIS when it submitted an actual detailed development proposal. The MDNS also included numerous other requirements and restrictions on any actual development.

The Commission held public meetings on the proposal on May 18 and 19, 2011. After taking public comment, the Commission classified the 279-acre proposed alpine ski area as recreation, except that the treed islands between the ski runs were classified Resource Recreation.[5] Clerk's Papers (CP) at 367-69.

The Commission also stated that the classification option it approved "would allow for the development of the MS 2000 proposal to develop one lift and seven ski runs on the 279-acre developed ski area . . . ." CP at 367. The Commission's action "predicated" this development on a number of other steps, among which were "[s]uccessful project level environmental review and permitting" and approval by the director of parks and recreation "of the final development plan for expansion of developed alpine skiing into the PASEA." CP at 367. The Commission's action also specified that the "MS 2000 proposal is conceptual in nature and that final

---

[4] WAC 197-11-350.

[5] The map at Clerk's Papers 371 entitled PASEA Land Classifications, shows the configuration of these classifications.

3

development plans will designate the location of the treed ski islands and developed ski runs."
CP at 367.

The report by the commission staff on the proposal adopted by the Commission and other options noted that the PASEA "is known to support sensitive plant associations and habitats suitable for Canada Lynx, Grey Wolf, and Wolverine listed as threatened, endangered, and candidate species respectively by the US Fish and Wildlife Service." CP at 101. The staff report stated that:

> [h]abitat provided in the PASEA retains its integrity given limited past disturbance by humans and its connectivity to other functional habitats throughout the park, Spokane County, and the greater Washington-Idaho landscape.

CP at 101. As climatic conditions change, the report noted, "[T]he PASEA (especially the highest areas on the mountain) may serve as a critical refuge for migrating and resident wildlife species." CP at 101. Finally, the report stated:

> From a biological perspective, the PASEA's significance is not inherent in its individual significant natural features, e.g., wetlands, old growth trees, or non-forested meadows, but in the assemblage of all of them, their interdependence, their undisturbed extent, and the diversity of habitats they create together. Protecting the most significant individual features and removing those of lesser significance may undermine their biological integrity by reducing connectivity and biologically fragmenting one natural system from another. Additional human presence would also result in impacts to resident wildlife species sensitive to large numbers of people and intense activity.

CP at 101.

In its comment letter, the Washington Department of Fish and Wildlife stated that the proposed expansion "will effectively eliminate nearly 300 acres of old-growth forest habitat and reduce the ecological value and function of the remaining habitat." CP at 126. The Department took the position that completing the EIS after issuing the MDNS would not effectively mitigate

all probable, significant adverse environmental impacts of the proposal. The Department of Natural Resources took the position that the proposal would adversely impact wildlife habitat.

## B.    PROCEDURAL BACKGROUND

The Lands Council petitioned for review in superior court, challenging the Commission's management classification[6] of the PASEA without an EIS. The Lands Council requested relief through the Administrative Procedure Act,[7] SEPA, the uniform Declaratory Judgments Act,[8] a statutory writ of certiorari,[9] and a constitutional writ of certiorari.

The Commission and MS 2000 moved for partial summary judgment dismissing the Lands Council's claims under the Administrative Procedure Act, SEPA, the Uniform Declaratory Judgments Act and the certiorari statute and ruling that the Lands Council lacked standing under SEPA. The Lands Council filed a cross motion requesting issuance of a constitutional writ of certiorari, which the Commission and MS 2000 opposed.

The superior court held that the Lands Council had standing to bring the action and that the Commission had properly followed SEPA in adopting its classifications in May 2011. On this basis, the court granted summary judgment to the Commission dismissing with prejudice all claims by the Lands Council under the Administrative Procedure Act, the uniform Declaratory Judgments Act, the statutory writ of certiorari, and SEPA. The court also denied the Lands

---

[6] Lands Council did not challenge the Commission's approval of MS 2000's basic concept.

[7] Chapter 34.05 RCW.

[8] Chapter 7.24 RCW.

[9] Chapter 7.16 RCW.

Council's petition for a constitutional writ of certiorari, finding no evidence of illegality or arbitrary and capricious conduct in conjunction with the Commission's challenged actions.

The Lands Council appealed, and the Commission cross appealed on the issue of standing. MS 2000 intervened in support of the Commission.

ANALYSIS

A.     INTRODUCTION

This appeal turns on two central issues: whether the Lands Council had standing to bring its action under SEPA and whether the Commission violated SEPA when it reclassified areas for expansion of alpine skiing in May 2011 without preparing an EIS. The resolution of these issues, in turn, depends on the nature of the May 2011 action: was it merely the adoption of a classification that would allow consideration of possible development proposals in the future, as the Commission urges; or was it the final action of the Commission approving some level of alpine ski development in the 279-acre expansion area, as the Lands Council argues? A review of the record shows that the Lands Council's characterization is correct.

We begin by examining the nature of the Commission's action and then turn to the standing and EIS issues.

B.     STANDARD OF REVIEW

The Lands Council challenges the classification decision and the MDNS issued for it. The heart of the challenge is the claim that an EIS should have been prepared for the classification decision, and not postponed to a later time. Challenges to an MDNS are reviewed under the "clearly erroneous" standard. *Norway Hill Pres. & Prot. Ass'n v. King County*, 87 Wn.2d 267, 271, 552 P.2d 674 (1976) (quoting *Ancheta v. Daly*, 77 Wn.2d 255, 259, 461 P.2d

531 (1969)). Under this standard, the court will overturn the agency's determination if, after reviewing all the evidence, it is left with the definite and firm conviction that the agency committed a mistake. *Norway Hill*, 87 Wn.2d at 274.

The superior court decision under review is an order of summary judgment dismissing the Lands Council's claims. When reviewing a summary judgment order, we engage in the same inquiry as the trial court. *Reynolds v. Hicks*, 134 Wn.2d 491, 495, 951 P.2d 761 (1998). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The parties do not argue that there are genuine issues of material fact. Therefore, we ask whether the Commission was entitled to judgment as a matter of law, reviewing the MDNS as a whole under the clearly erroneous standard.

## C.    THE NATURE OF THE CHALLENGED ACTION

The heart of the Commission's action, as noted above, was to classify the 279-acre area proposed for alpine ski expansion as Recreation, except that the treed islands between the ski runs were classified Resource Recreation. According to WAC 352-16-020(1), areas classified as Recreation "are suited and/or developed for high-intensity outdoor recreational use, conference, cultural and/or educational centers, or other uses serving large numbers of people." Resource Recreation areas, on the other hand, "are suited and/or developed for natural and/or cultural resource-based medium-intensity and low-intensity outdoor recreational use." WAC 352-16-020(2).

The effect of a classification is spelled out in WAC 352-16-030(1), which states:

[t]he director shall develop management guidelines for each land classification listed in WAC 352-16-020. The guidelines shall provide specific direction for

each classification, outlining the philosophy of each classification, its appropriate physical features, location, allowed and prohibited activities, and allowed and prohibited developments.

Under this provision, adoption of a classification also fixes which uses are allowed and which are prohibited within its bounds.

The record does not contain the management guidelines which the director was required to adopt under WAC 352-16-030. However, the Commission's own action in adopting the classification made clear that the proposed alpine ski area expansion is an allowed use under the terms of that action. Immediately following the listing of the classifications, the Commission's adoption document stated, "This option would allow for the development of the MS 2000 proposal to develop one lift and seven ski runs on the 279-acre developed ski area . . . ." CP at 367. Thus, whether the management guidelines required under WAC 352-16-030 were in fact in place, the Commission's own document expressly allowed the proposed ski expansion in the 279-acre area subject to the classification.

The Commission's approval document also makes clear that adoption of the classification did not simply make ski areas in general allowed uses, much as a comprehensive plan or zoning ordinance might. Instead, the Commission's approval document stated unambiguously that approval of the classification "would allow for the development *of the MS 2000 proposal to develop one lift and seven ski runs . . . .*" CP at 367 (emphasis added). Similarly, the Commission's map at CP 371 showing the adopted classifications plainly shows the layout of a specific ski area. The approval, however, does expressly state that the "MS 2000 proposal is conceptual in nature and that final development plans will designate the location of the treed ski islands and developed ski runs." CP at 367. This wording makes clear that the "conceptual"

element of the action does not extend to whether the Commission approved an alpine ski area of this size and nature. CP at 367. Instead, it simply recognizes that the final location of the runs and islands may vary from that shown on the map.

The Commission points out that its approval document predicates the proposed development on "[d]irector approval of the final development plan for expansion of developed alpine skiing into the PASEA." CP at 367. The Commission argues that this shows that approval of the expansion will only come at this subsequent stage and that any approval would be given with the benefit of an EIS that examines the specific changes proposed to the environment. At oral argument, the Commission stated that the director still could deny the proposal completely, and the Lands Council stated that the director could only approve or deny the single proposal, but could not choose any of the other options that were before the Commission.

As shown above, the Commission's action approved the proposal by MS 2000 to expand its alpine ski resort into the PASEA, subject to a number of reservations. Among those are the limitations that the final location of the runs and islands may vary and that the director may approve or deny the final development plans. The only other reference to "final development plans" in the Commission's approval is in the statement that the proposal is conceptual "and that final development plans will designate the location of the treed ski islands and developed ski runs." CP at 367.

Reading these provisions together strongly suggests that the purpose of the director's review of the final development plan is not to revisit the Commission's decision to approve the expansion. Rather, the director would review the precise location and configuration of the runs,

9

a review analogous to construction-level review of grading plans and similar matters for an already approved development. In land use law generally, the possibility that a proposal could fail if construction-level standards are not met subtracts nothing from the nature of a prior *use* approval for the proposal. Here, similarly, the Commission's May 2011 classification decision, read in its context, approved the expansion of the alpine ski resort into the PASEA, subject to the director's review of the precise location of runs, islands, and similar detailed components. The 2011 classification was the agency decision approving the use, even though the proposal could still conceivably founder if the director could not approve the precise configuration of the runs.

Having determined the nature of the Commission's action to be a use approval, we now examine the standing issue and the merits.

D.    STANDING

The Commission argues that the Lands Council lacks standing under SEPA, because the classification decision only authorizes the possibility of general land uses for the potential expansion area. Thus, the Commission argues, any injury to the Lands Council is only threatened and not the immediate, concrete, and specific injury necessary for standing.

SEPA grants an aggrieved person the right to judicial review of an agency's compliance with its terms. *Harris v. Pierce County*, 84 Wn. App. 222, 232, 928 P.2d 1111 (1996); RCW 43.21C.075(1). "A party wishing to challenge actions under SEPA must meet a two-part standing test: (1) the alleged endangered interest must fall within the zone of interests SEPA protects, and (2) the party must allege an injury in fact." *Kucera v. State, Dep't of Transp.*, 140 Wn.2d 200, 212, 995 P.2d 63 (2000).

10

Damage to elements of the environment aims at the core of those interests protected by SEPA. *See Kucera*, 140 Wn.2d at 212-13 (quoting *Snohomish County Prop. Rights Alliance v. Snohomish County*, 76 Wn. App. 44, 52-53, 882 P.2d 807 (1994)); RCW 43.21C.010; WAC 197-11-030. Here, the Lands Council alleges that the ski area expansion will jeopardize wildlife and its habitat. These interests are plainly within the zone of those protected by SEPA, thus meeting the first prong of the standing test.

The standing dispute in this appeal revolves around the second requirement, that of injury in fact. The elements of this requirement have been phrased in differing ways. Our Supreme Court in *Kucera* held, "The injury in fact element is satisfied when a plaintiff alleges the challenged action will cause 'specific and perceptible harm.'" *Kucera*, 140 Wn.2d at 213 (quoting *Leavitt*, 74 Wn. App. at 679). A sufficient injury in fact is properly pleaded when a property owner alleges "immediate, concrete, and specific" damage to property, even though the allegations may be "speculative and undocumented." *Kucera*, 140 Wn.2d at 213 (quoting *Leavitt*, 74 Wn. App. at 679). "Where the plaintiff 'alleges a threatened injury rather than existing injury, he or she must also show that the injury will be immediate, concrete, and specific.'" *Harris*, 84 Wn. App. at 231 (quoting *Leavitt*, 74 Wn. App. at 679).

The Commission does not dispute that expansion of the ski area would cause injury in fact to members of the Lands Council by limiting or preventing their present use of the area. It argues, rather, that the classification decision merely authorized the possibility of general land uses for a potential expansion and that the director will make the actual decision on expansion at a later time.

11

Our discussion above shows that this characterization is incorrect. The decision to approve expansion of the ski area was made by the Commission in May 2011, subject to the director's subsequent review of the precise location of the runs and islands. The Commission's action effectively approved the use.

Land use approvals often proceed in phases. The principal regulatory approval of a subdivision, preliminary subdivision approval, is followed by final subdivision approval to ensure that the conditions of the preliminary approval are followed. *See* RCW 58.17.170. The conditional use approval of a shopping center may be followed by grading permits, critical area permits, and construction permits. None of these implementing permits, though, disguises the step at which the decision actually allowing the use was taken. Under *Kucera*, that is the step at which standing to challenge the use arises, as long as the plaintiff has shown the requisite injury to itself or its members. *See Kucera*, 140 Wn.2d at 213. As shown above, that step occurred here with the May 2011 classification decision.

This conclusion is also consistent with other appellate decisions. *Harris* held that owners of property along a proposed county trail had not shown injury in fact sufficient for standing. *Harris*, 84 Wn. App. at 231. The court observed that the trail would be built only if the county condemned it and that whether the plaintiff's property would even be subject to eminent domain appeared to depend on future decisions. *Kucera*, 140 Wn.2d at 231-32. Here, in contrast, the decision to allow this ski area to expand into this area has been made. The Commission's decision has none of the uncertainties present in *Harris*.

The decision in *Magnolia Neighborhood Planning Council v. City of Seattle*, 155 Wn. App. 305, 230 P.3d 190 (2010), is more closely on point. In 2008 Seattle adopted the Fort

Lawton Redevelopment Plan (FLRP), which was required as part of the conveyance of former federal property to the City. *Magnolia*, 155 Wn. App. at 310-11. The FLRP included the construction of between 108 and 125 market-rate housing units, along with other housing for homeless persons. *Magnolia*, 155 Wn. App. at 310. The City argued that the plaintiff, an organization of nearby property owners, lacked standing because the FLRP is subject to federal approval and the City's application could be rejected. *Magnolia*, 155 Wn. App. at 312. The court rejected this argument, holding that the plaintiff had standing since "it is a party representing interests of those owning property adjacent to a City-proposed project and who allege that the project will injure their property without SEPA review." *Magnolia*, 155 Wn. App. at 312-13. The Lands Council's claims are no more speculative than these.

Finally, our Supreme Court in *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 303, 268 P.3d 892 (2011), held that standing requirements are relaxed where the injury complained of is procedural in nature. Specifically, to show a procedural injury:

> a party must (1) identify a constitutional or statutory procedural right that the government has allegedly violated, (2) demonstrate a reasonable probability that the deprivation of the procedural right will threaten a concrete interest of the party's, and (3) show that the party's interest is one protected by the statute or constitution.

*Five Corners Family Farmers*, 173 Wn.2d at 303. Whatever the result on the merits, the Lands Council's claims showed a "reasonable probability" that the alleged improper timing of the EIS "will threaten" a concrete interest of its members. *Five Corners Family Farmers*, 173 Wn.2d at 303.

SEPA authorizes judicial review of an agency's compliance with its terms. *See Harris*, 84 Wn. App. at 232; RCW 43.21C.075. Whether judged under the basic test for standing or

13

under the more relaxed standards for procedural injury, the Lands Council has demonstrated injury in fact and that it has standing to bring this challenge under SEPA. Because the Lands Council has standing under SEPA, it is not necessary to address the other statutes under which it alternatively asserts the same claims. We turn, therefore, to the merits of the challenge under SEPA.

E.    SEPA AND THE TIMING OF EIS PREPARATION

The Lands Council argues that the Commission violated SEPA by not preparing an EIS before classifying the ski expansion area in May 2011. The Lands Council is correct, because approval of the classification was effectively the Commission's decision to approve expansion of the ski area.

The commission staff prepared separate environmental checklists and MDNSs under SEPA for the land classification and the conceptual plan. The MDNS for the conceptual plan included the condition that MS 2000 would be required to prepare an EIS prior to any ski area expansion. The MDNS for the classification decision did not contain such a condition. In its report to the Commission on both the land classification and conceptual plan decisions, the commission staff determined that the proposed ski area expansion was likely to have a significant adverse impact on the environment.

An EIS is required for actions that are not exempt from SEPA and that have a "probable significant, adverse environmental impact." RCW 43.21C.031. As noted, the Commission's MDNS on the conceptual plan contains a condition requiring an EIS for the ski area expansion, representing a determination that the proposed ski area expansion will have a probable

14

significant adverse environmental impact. The question is whether SEPA required the EIS to be prepared before the May 2011 classification decision.

The timing of environmental review has long vexed the application of SEPA to the iterative progression of land use approvals. On one hand, review too near the inception of the process can become a discarded hypothetical exercise as features of the proposal change and become more specific. On the other hand, our Supreme Court observed that "the risk of postponing environmental review is 'a dangerous incrementalism where the obligation to decide is postponed successively while project momentum builds.'" *King County v. Boundary Review Bd.*, 122 Wn.2d 648, 664, 860 P.2d 1024 (1993) (quoting William H. Rodgers, *The Washington Environmental Policy Act*, 60 WASH. L. REV. 33, 54 (1984)). The court recognized that this "may begin a process of government action which can 'snowball' and acquire virtually unstoppable administrative inertia." *King County*, 122 Wn.2d at 664. To avoid this, "decisionmakers need to be apprised of the environmental consequences *before* the project picks up momentum, not after." *King County*, 122 Wn.2d at 664.

The SEPA rules and the case law chart the proper navigation between these extremes. First, WAC 197-11-055(2) states:

> The lead agency shall prepare its threshold determination and environmental impact statement (EIS), if required, at the earliest possible point in the planning and decision-making process, when the principal features of a proposal and its environmental impacts can be reasonably identified.

To help identify this "earliest possible point," WAC 197-11-055(2)(a) specifies that:

> [a] proposal exists when an agency is presented with an application or has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal *and* the environmental effects can be meaningfully evaluated.

15

No. 43158-1-II

In addition, the rules make clear that

> [t]he fact that proposals may require future agency approvals or environmental review shall not preclude current consideration, as long as proposed future activities are specific enough to allow some evaluation of their probable environmental impacts.

WAC 197-11-055(2)(a)(i).

The timing of EIS preparation is more specifically treated in WAC 197-11-406, which states that an EIS

> shall be prepared early enough so it can serve practically as an important contribution to the decision making process and will not be used to rationalize or justify decisions already made. EISs may be "phased" in appropriate situations (WAC 197-11-060(5)).

Subject to these standards, WAC 197-11-060(5)(b) allows agencies to phase environmental review "to focus on issues that are ready for decision and exclude from consideration issues already decided or not yet ready." Among the examples of appropriate phased review is the sequence "from an environmental document on a specific proposal at an early stage (such as need and site selection) to a subsequent environmental document at a later stage (such as sensitive design impacts)." WAC 197-11-060(5)(c)(ii). Phased review is inappropriate when, among other situations, it would avoid discussion of cumulative impacts. WAC 197-11-060(5)(d)(ii). When an agency knows it is using phased review, it must say so in its environmental document. WAC 197-11-060(5)(e). The MDNS for the classification decision stated that it is using phased review.

As concluded above, the May 2011 classification decision approved a ski area expansion consisting of one lift and seven ski runs in a specific 279-acre area, subject to the director's subsequent approval of the precise location of runs, islands, and similar detailed components. As

16

also shown above, the Commission itself deemed this expansion to require an EIS. At this point, in May 2011, the principal features of expanding the ski area and its environmental impacts could be reasonably identified. At this point, the agency was actively preparing to make a decision on one or more alternative means of accomplishing the expansion. At this point, an EIS would have made an important contribution to the decision whether the ski area should be expanded. Thus, under WAC 197-11-055(2) and WAC 197-11-406 an EIS should have been prepared for the decision to classify the 279 acres in May 2011.

The Commission argues strongly, though, that the most rational and effective time for an EIS is after the director's final decision, since only then will the actual location, size, and configuration of the ski runs be known; only then will the precise impacts of the proposal be known. Our Supreme Court rejected a similar argument in *King County*, 122 Wn.2d at 662. That appeal examined whether a determination of nonsignificance (DNS) issued by Black Diamond for two annexations was flawed because it did not consider the impacts of future development in the annexed area. Those defending the annexation argued that the DNS was proper, because consideration of the effects of future development would be both premature and speculative. *King County*, 122 Wn.2d at 662.

The Supreme Court disagreed. Although the environmental checklist made clear that the properties were "destined for development," *King County*, 122 Wn.2d at 665, no specific development proposals had been submitted and no immediate land use changes would follow annexation. Even so, the court held that Black Diamond erred by not considering the future development that is likely after the annexation. *King County*, 122 Wn.2d at 662-63. The court based this conclusion on the rule that "an EIS is required if, based on the totality of the

circumstances, future development is probable following the action and if that development will have a significant adverse effect upon the environment." *King County*, 122 Wn.2d at 663. Because the type of development discussed in the environmental checklist would have a probable significant adverse environmental impact, the court held that an EIS was needed for the annexation. *King County*, 122 Wn.2d at 665-67.

Here, the effects of the 2011 classification decision were much less speculative than those of Black Diamond's annexation. The Commission knew the proposed number of lifts and runs. It knew the proposed configuration and location of those runs. The only uncertainty was whether their precise location would be adjusted by the Director at the final detailed review stage. The nature of the proposed use, however, expansion of the ski area into these 279 acres, was known in May 2011. The effects of that expansion, thus, could be determined at that time with every bit as much specificity as could the effects of Black Diamond's annexation. Furthermore, as shown by its MDNS, the Commission knew that an EIS was needed for the proposed expansion at some point. Just as SEPA required an EIS for the Boundary Review Board's annexation decision in *King County*, SEPA required the preparation of an EIS for the Commission's management classification decision here.

The decision in *Hayden v. City of Port Townsend*, 93 Wn.2d 870, 879, 613 P.2d 1164 (1980), *overruled on other grounds by Save a Neighborhood Environment (SANE) v. City of Seattle*, 101 Wn.2d 280, 676 P.2d 1006 (1984)), does not blunt the effect of *King County*. In *Hayden*, the City's SEPA administrator made a negative threshold determination, finding no significant environmental impacts for a proposed property rezone. *Hayden*, 93 Wn.2d. at 873. The court upheld the City, stating that "nonproject rezoning has been held not to require an EIS

as long as the council retains the authority to require such an evaluation at the project permit stage." *Hayden*, 93 Wn.2d. at 879. Significantly, in taking this position the court relied on the fact that the rezone "carried no specific building project with it." *Hayden*, 93 Wn.2d. at 879. Here, in contrast, the classification decision effectively approved a specific proposal. Thus, even if this holding in *Hayden* retains any force after *King County*, it has no application to the facts of this appeal.

The Commission determined that an EIS was required for expansion of the ski area. The Commission approved that expansion in May 2011, subject only to the director's subsequent review of the precise location of the runs. The Commission failed, however, to prepare an EIS when it approved the use. Instead, it postponed its preparation until the later review of the precise location of the runs. This approach invites the sort of snowball effect and decision by administrative inertia condemned by *King County*, 122 Wn.2d at 664. To avoid this, our Supreme Court mandated that decision makers "be apprised of the environmental consequences *before* the project picks up momentum, not after." *King County*, 122 Wn.2d at 664. Both the holding and the policies of *King County* show that this point arrived, at the latest, when the decision to classify the land was made. Under the WAC and the case law, the Commission erred in neglecting to prepare the EIS for that decision. If the director's subsequent review were to change any of the environmental impacts of the proposal, supplemental environmental review could be carried out at that subsequent stage. *See* WAC 197-11-055(2)(a)(i).

F.    CONCLUSION

Over 40 years ago, with the adoption of SEPA, we first read in Washington law that each generation is trustee of the environment for succeeding generations.[10] We read also that it is the "continuing responsibility" of the state and its agencies to act so we may carry out that trust. RCW 43.21C.020(2). SEPA demands that this trust be more than merely a stirring maxim or artful slogan. Instead, it is the quickening principle in the application of the statute. Consistently with the statute's purposes, the Commission's failure to prepare an EIS for the 2011 classification decision violated the terms of SEPA and its rules and was contrary to governing case law.

We affirm the trial court's ruling that the Lands Council had standing under SEPA to bring this action. We hold that SEPA required the Commission to prepare an EIS for its May 2011 classification decision and, accordingly, we reverse the trial court's summary judgment order dismissing the Land Council's claims under SEPA. We make no decision on the alternative claims under the Administrative Procedure Act, uniform Declaratory Judgments Act, statutory certiorari, and constitutional certiorari.

BJORGEN, J.

We concur:

PENOYAR, J.

WORSWICK, C.J.

---

[10] RCW 43.21C.020.